**UNITED STATES of America, Plaintiff-Appellee,**

v.

**James Melvin WILCOX, Defendant-Appellant.**

**No. 27370.**

United States Court of Appeals, Fifth Circuit.

Aug. 9, 1971.

Rehearing Denied Oct. 30, 1971.

Harry W. Prebish, Richard M. Gale, Miami, Fla., for defendant-appellant.

Morton Orbach, Asst. U. S. Atty., Robert W. Rust, U. S. Atty., Michael J. Osman, Theodore Klein, Asst. U. S. Attys., Miami, Fla., Will Wilson, Asst. Atty. Gen., Sidney M. Glazer, Atty., U. S. Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before JOHN R. BROWN, Chief Judge, and GOLDBERG and CLARK, Circuit Judges.

JOHN R. BROWN, Chief Judge:

 This is a Fifth Amendment case of unusual dimensions. Typically either the prosecution is trying to compel testimony from a witness or the defendant is asserting that the witness should invoke the privilege against self-incrimination.[1] Here, however, for the first time we have been able to discover, the defendant Wilcox sought to force Government wit-

---

1. This has ordinarily proved unavailing. See, e. g., Poole v. United States, 9 Cir., 1964, 329 F.2d 720; Hudson v. United States, 5 Cir., 1952, 197 F.2d 845; Tay-lor v. United States, 2 Cir., 1907, 152 F. 1; VIII Wigmore on Evidence, §§ 2196, 2270 (McNaughton Ed. 1961).

ness Maruzewski to testify in person, even though the latter sought and judicially received the protection of the Fifth Amendment. We think Maruzewski's successful invocation of the privilege and the consequent use of his earlier testimony from a prior trial deprived Wilcox of none of his constitutional rights and therefore affirm his conviction.

## I. In the Beginning

In 1967 Wilcox was convicted by a jury of transferring counterfeit Reserve Notes with knowledge of their unauthenticity.[2] During that trial, Maruzewski, the Government's chief witness and the party to whom Wilcox allegedly had transferred the counterfeit notes, gave testimony which gravely inculpated both Wilcox and himself. Maruzewski testified that he had met Wilcox in 1963, in Fort Lauderdale, Florida, where Maruzewski was then renting a room from Wilcox. As a result of this landlord-tenant status they established "a social acquaintance," which amounted primarily to mere "social talk." During some of their conversations, the subject of counterfeit currency "just popped up every once in a while," with Wilcox each time being the instigator. Once Wilcox actually produced a counterfeit $20.00 bill, showed it to Maruzewski, and asked him if he were interested in making a deal. Consequently the two men entered into an arrangement whereby Maruzewski would be supplied the bills from Wilcox, on a consignment basis. This meant that Wilcox would absorb the initial expense of acquiring the bills, and that then Maruzewski would receive and pass them. He would subsequently return Wilcox's investment in the bills, and whatever sum remained would be divided equally between them.

Maruzewski was forwarded $10,000 in counterfeit currency, all in twenty dollar bills. He then began his sojourn as a spendthrift. This journey took him to Louisiana, as he had been directed by Wilcox to stay out of the Florida area when passing the bills. Eventually he was apprehended by federal agents in Detroit, Michigan. At the time of his arrest, he was still in possession of some of the illicit currency.

Subsequently, Maruzewski was returned to Fort Lauderdale to assist in the investigation and apprehension of Wilcox. Once there, he contacted Wilcox by telephone, the call being made from police headquarters, and, with Maruzewski's permission, being recorded by federal agents. This conversation, too, contained incriminating matter which was read to the jury.

Pursuant to that telephone conversation, Maruzewski went to Wilcox's house. He was accompanied by an agent Rivers, who posed as "Mad Dog," an alleged friend of Maruzewski. During this visit Maruzewski handed a number of counterfeit bills to Wilcox, who accepted them and put them in an envelope. All of the action and conversation occurred directly in front of Agent Rivers, and he verified and corroborated all of Maruzewski's testimony concerning the meeting.

At the time he testified, Maruzewski had already pleaded guilty as an accomplice to the counterfeiting charge here in dispute. Also, he had already been convicted and paroled. At that time he was serving a sentence in a state prison for another unrelated, intervening counterfeiting conviction.[3]

Primarily as a result of Maruzewski's devastating testimony, much of which was corroborated by one or more secret service agents, Wilcox was convicted of the counterfeiting charge. On appeal

2. This is made a criminal offense under 18 U.S.C.A. § 473.

3. Because Maruzewski received this state conviction the federal authorities have revoked his parole in the instant offense and have placed a detainer on him.

this Court reversed his conviction and remanded for a new trial.[4]

## II. The Witness Takes the Fifth

In accordance with our mandate, a new trial was held, but it terminated in a mistrial almost immediately because counsel for one of the parties mentioned in his opening argument to the jury that Maruzewski was not present and would not appear to testify.

Subsequently when this case came on to be tried for the third time the Trial Judge was fully cognizant of the witness's reluctance to testify, for it was again brought to his attention by Government counsel prior to the trial. Knowing this, the Court convened a post-voir dire, pretrial conference to attempt to determine whether the witness did intend to invoke the privilege against self-incrimination, and whether the witness had a valid reason for doing so.

At this hearing Maruzewski was represented by court-appointed counsel. Out of the presence of the jury, he was subjected to an examination by the Court and counsel for the Government and Wilcox. Following the advice of his attorney Maruzewski invoked the Fifth Amendment to virtually all of the questions which were propounded. In conclusion the Judge found that: (i) Maruzewski would claim the Fifth Amendment privilege against self-incrimination at the prospective trial on the merits,[5] (ii) that he could validly do so without being contemptuous, (iii) as a result, the witness need not take the witness stand, and (iv) his testimony from the first trial could be introduced to the jury instead.

## III. Prior Testimony Used Against Accused

Thus, at Wilcox's third trial, the witness was not called to testify, and his testimony from the first trial was read into the record before the jury. Wilcox was again convicted, and he appeals.

In an effort to sustain his burden Wilcox presents four arguments: [i] the Court erroneously believed that the witness "had an absolute right to refuse to testify [by merely saying that he was] invoking the Fifth Amendment," and that as a result of this incorrect interpretation of the extension of the privilege the Judge tendered incorrect admonitions, and incorrect advice, to the witness at the most crucial time possible— when the witness was attempting to decide whether to testify or to invoke the privilege. [ii] It is the duty of the Court to do everything reasonably within his power to compel a witness to testify, even to the point of threatening him with contempt, but in this case the Court instead, "in effect, encouraged the witness not to testify, by telling him to invoke the Fifth Amendment so he could avoid testifying and at the same time avoid any contempt proceedings against him." [iii] Since the witness had already pleaded guilty to, and had already been convicted of, the same offense as is here in question, he had already fully incriminated himself with respect to that matter, and he was estopped from invoking the Fifth Amendment in regard to any aspect of that transaction. And [iv] as the possibility of perjury in the

---

4. Wilcox v. United States, 5 Cir., 1967, 387 F.2d 60. We reversed and remanded the first conviction because prejudicial error had been committed during the cross-examination of certain character witnesses, a matter totally unrelated to the issues before us on this appeal.

5. Despite the many cases in which the courts have ruled on the right of a witness in a criminal trial to invoke the Fifth Amendment privilege against self-incrimination after he has already testi-

fied at a prior judicial proceeding, we have not found one which, on the merits, is identical to the case at bar. See VIII Wigmore on Evidence, §§ 2250–2284 (McNaughton Ed. 1961) for an exhaustive compilation of these cases. In virtually all of the other cases the first convocation was either a grand jury investigation or special Senate committee hearing, or a criminal trial in which the witness had been awarded the supreme protection of a special immunity provision or other executive or legislative immunity.

giving of testimony is not a valid basis upon which one may claim the privilege, it was error for the Court, upon learning from Government counsel that Maruzewski "could commit perjury" if he should testify again, not to have made an in-depth inquiry to determine whether this was the witness's reason for refusing to testify.

## IV. Determining Likely Incrimination Short of Actual Incrimination

Considering first Wilcox's major contention—that Maruzewski should not have been permitted to invoke the privilege against self-incrimination at the third trial until (i) the Trial Judge had first made a far more searching inquiry than he had conducted to determine the validity of the witness's apprehension of incrimination, and until (ii) the Court had asserted substantial pressure on the witness, by utilizing all of the means at his disposal, including his contempt powers. The key question then becomes whether the Judge properly determined that the protection of the Fifth Amendment was proper for the witness here.

The best illustration of how the Trial Judge should determine whether the privilege against self-incrimination can rightfully be invoked is Hoffman v. United States, 1951, 341 U.S. 479, 71 S. Ct. 814, 95 L.Ed. 1118. There the petitioner had refused to obey a court order to answer certain questions in a grand jury investigation into violations of a large number of federal statutes, questions largely dealing with whether the petitioner was acquainted with or knew the whereabouts of one William Weisberg. The Court held that it is for the Trial Judge to decide whether using the privilege is justified, yet pointed out the

crucial difficulty in making this determination:

"However, if the witness, upon interposing his claim, were required to prove the hazard in the sense in which a claim is usually required to be established in court, he would be compelled to surrender the very protection which the privilege is designed to guarantee."

341 U.S. at 486, 71 S.Ct. at 818, 95 L. Ed. at 1124.

Since the Court then cannot directly inquire of the witness as to the nature of the danger he senses, how should it then proceed? *Hoffman* provides the guidelines:

"To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result. The trial judge in appraising the claim, 'must be governed as much by his personal perception of the peculiarities of the case as by the facts actually in evidence.' See Taft, J., in *Ex parte Irvine*, 74 F. 954, 960 (C.C.S.D.Ohio, 1896)." [6]

The Court then went on to analyze the "circumstances which the District Court should have considered in ruling upon petitioner's claim of privilege." First the Court noted that the presiding Judge was the one who had impaneled the grand jury and was intimately familiar with the purposes of the investigation. Since Weisberg was being sought for his connection with the crimes involved and since the petitioner had admitted that he knew Weisberg,

---

6. Stated less broadly, "It must appear to the court, from the character of the question, and the other facts [already] adduced in the case, that there is some tangible and substantial probability that the answer of the witness may help to convict him of a crime." Ex parte Irvine,

S.D.Ohio, 1896, 74 F. 954, 960. See also United States v. Coffey, 3 Cir., 1952, 198 F.2d 438, 440: Is it impossible to say from the questions propounded in the light of the circumstances disclosed, that they could have been answered with entire impunity?

the questions would have a strong possibility of implicating the petitioner for some of the crimes under investigation. Furthermore this conclusion of potential incrimination was buttressed by the Judge's knowledge that the petitioner had a long police record and was widely recognized as a key member of the organized criminal underworld. Therefore, "in this setting it was not 'perfectly clear, from a careful consideration of all the circumstances in the case, that the witness is mistaken, and that the answer[s] cannot possibly have such tendency' to incriminate. Temple v. Commonwealth, 75 Va. 892, 898 (1881), cited with approval in Counselman v. Hitchcock, 142 U.S. 547, 579–580, 12 S.Ct. 195, 204, 35 L.Ed. 1110, 1119, 1120 (1892)." 341 U.S. at 488, 71 S.Ct. at 819, 95 L. Ed. at 1125.

So our inquiry must be: Did the Judge truly have a basis in fact for thinking that by answering, the witness would expose himself to a substantial danger of incrimination? We believe that he did.

Here the District Judge was the same Judge who had been on the bench during Wilcox's previous two trials, so he was acquainted with the subtleties and intricacies of those prior proceedings which might have an effect on Maruzewski. Besides being aware of the dramatic testimony which Maruzewski had given at the first trial, the Court also knew that he had been convicted in the interim of still another counterfeiting offense. Furthermore, the Court was aware that counsel had advised Maruzewski that there were other offenses for which he could be prosecuted, that Maruzewski's parole had been revoked and that a detainer had been placed on him. He was further cognizant of the Government's adamant refusal to disclose whether or not it had plans to prosecute Maruzewski further after Wilcox's trial.[7] Also, the Judge's acquaintance with Maruzewski in the prior trial gave him knowledge that Maruzewski was a man of disreputable background and that his "[c]hief occupation [has] involve[d] evasion of * * * criminal laws." *Hoffman, supra,* 341 U.S. at 487, 71 S. Ct. at 819, 95 L.Ed. at 1125. Finally the Government conceded that it would seek to elicit essentially the same testimony as Maruzewski revealed in the first trial.[8]

7. "[BY COUNSEL FOR MARUZEWSKI]:

Q Have any other prosecutions been instituted against you by the Federal Government other than the one for which you did serve time or for which you were paroled and for which your parole has now been revoked?
A No.
Q Has anyone advised you from the Government or any other source that there is an intention to further prosecute you in connection with counterfeiting?
A Not at this point, no.
Q Not up to this point?
A No.

* * * * *

THE COURT:
Mr. Prebish [Defense Counsel], I take the position that you have had the disclosure that he consulted with his attorney and his attorney advised him of the possible criminal prosecution and that he has a well-founded fear of being subjected to criminal prosecution; and I further take the position for me to require him to disclose the details of those things would be a violation of his Fifth Amendment rights in themselves.
[DEFENSE COUNSEL]:
May I just offer to proffer one other statement?
THE COURT:
All right, sir.
[DEFENSE COUNSEL]:
I proffer this through Mr. Orbach [Government Counsel]. I would either ask Mr. Orbach to state in the record or I would like to call him as a witness to testify that he has no knowledge of any kind that there is any intention on the part of the Government at this time to prosecute the witness for any crime that might be involved as a result of his testimony.
[GOVERNMENT COUNSEL]:
I don't see the relevancy and I would object to being required to furnish that information.
THE COURT:
I will sustain the objection."

8. "THE COURT:
Does the Government propose to ask him any different or other questions than

 Thus we reject Wilcox's contention that the Court should have conducted a more factually detailed inquiry into whether "the witness feared further prosecution by the Government for acts involving violations of the counterfeiting laws or for any other crime—without the requirement that the witness specify the crime." Certainly the Judge in this case had as much, if not more, information about possible incrimination of the witness as did the Judge in *Hoffman*. So such an inquiry was unnecessary in light of what the Judge already knew. Furthermore such an inquiry would be impermissible under *Hoffman* and Malloy v. Hogan, 1964, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 for it in itself would force the witness to specify, identify or call attention to other crimes for which he might be charged. We need not discuss here the difficult problem of how a Judge can determine the appropriateness of the Fifth Amendment privilege when he lacks the clear-cut circumstances in this case. That delineation must await another day and case.

 *Hoffman* reveals also why this case is distinguishable from the often-arising situation in which the witness has been given immunity if he testifies. It is a truism that if one has immunity he cannot be prosecuted and if so, he has no fear of incrimination. Once the Judge knows this, his *Hoffman* analysis is complete—the witness must testify for he faces no incriminatory dangers. We thus find inapposite the analogy to Mason v. United States, 10 Cir., 1969, 408 F.2d 903, and Wilcox's stress on the need for the Trial Judge to use contempt, or the threat thereof, to persuade the witness to relinquish his Fifth Amendment claim. In *Mason* the Court cited the witness for contempt, but only after immunity had been granted.[9]

those which were asked on the first examination?

[GOVERNMENT COUNSEL]:

The questions will not be the exact questions, but the questions will be along the same line, to cover the same material that was covered in the original examination."

9. In *Mason* three witnesses testified at the trial of a fourth party. The case was remanded for a second trial and all three witnesses refused to testify, claiming instead their right to invoke the Fifth Amendment. They were immediately granted full immunity under a federal statute, but they still refused to testify. The court halted the trial, appointed counsel to assist the recalcitrant witnesses, and interrogation was resumed. When the three still persisted in their refusal to testify the Judge cited them for contempt. As their testimony was unavailable at the second trial, the Court permitted the testimony which they had given at the first trial to be read to the jury. All of these actions of the trial court were upheld on appeal.

The grant of immunity under the federal statute to the witnesses in *Mason* is coextensive with the protection afforded under the Constitutional privilege itself, Counselman v. Hitchcock, *supra*; Brown v. Walker, 1896, 161 U.S. 591, 16 S.Ct. 644, 40 L.Ed. 819; Heike v. United States, 1913, 217 U.S. 423, 30 S.Ct. 539, 54 L.Ed. 821, as to both federal and state prosecutions. Reina · v. United States, 1960, 364 U.S. 507, 81 S.Ct. 260, 5 L.Ed. 2d 249. Since the granting of immunity is not a judicial function, but it is an executive or legislative power, United States v. Ford, 1878, 99 U.S. 594, 25 L.Ed. 399; Ullman v. United States, 1955, 350 U.S. 422, 76 S.Ct. 497, 100 L.Ed. 511, a grant of immunity under a federal statute, as was given to the witnesses in *Mason*, virtually decides for the Court whether to permit the invocation of the privilege. In fact, the decision whether the witness will testify or be permitted not to on grounds of self-incrimination is no longer under judicial auspices. The protection is complete, and unless the witness commits perjury while he testifies under the protection of the statute or refuses to testify despite the immunity of the statute, so as to become contemptuous, he need fear no future prosetion for the matter he reveals. In *Mason* therefore the invocation of the privilege was clearly inappropriate and the contempt power was rightfully called into play.

Both state and federal Governments have long been able to procure information through testimony otherwise within the privilege of the Fifth Amendment, by granting immunity under a statute enacted specifically for this purpose. These

Wilcox contends that *Mason* calls for the pressure of contempt and failing its assertion, the prior testimony of a live, present but unwilling witness may not be used. This claim ignores a number of important factors. First, the Judge is present as the embodiment of the Constitution, charged with the firm duty to see that the rights of all are upheld —the defendants, the witnesses and the public. Whether and to whatever extent it may be the duty of the trial judge to caution a witness about his Fifth Amendment rights, a careful one never hesitates. At that stage the judge's role of impartiality commands that he not take sides, certainly not against the witness and certainly not in a way that seeks to avoid the difficulties of *Hoffman* by urging the witness to speak. Contempt is not something lightly to be cast about. The improper use of the power or the threat of its use when the likelihood is that it might not lawfully be invoked at all degrades both the importance of the Constitutional privilege and the function of the Court. Lastly, the Judge must be sensitive to the rights of the defendant. In that action, he is aware that he must handle the asserted claim in a way that does not prejudice the defense. Knowing that a witness will claim the Fifth Amendment, it becomes reversible error to allow the Government to call the witness in order to account for his absent testimony. See San Fratello v. United States, 5 Cir., 1965, 340 F.2d 560. There was no place here for contempt or the threat of it.

### V. Inquiry on Further Prosecutions of Witness

Wilcox claims similarly that an area of inquiry the Court should have permitted or pursued himself was the Government's intention "concerning possible prosecution of the witness based on his [third] trial testimony," and whether "the witness invoked his privilege because of dissatisfaction with the government's revocation of his parole and the detainer placed on him."

It does not seem likely that the Government could competently have answered whether it intends to prosecute the witness for acts relating to his testimony during the current trial as the Government could not yet be certain what the witness would testify to on the third trial or which, if any, of such crimes the Executive would in its unlimited discretion undertake to prosecute. United States v. Cox, 5 Cir., 1965, 342 F.2d 167 (en banc), cert. denied sub nom. Cox v. Hauberg, 381 U.S. 935, 85 S.Ct. 1767, 14 L.Ed.2d 700. See also United States v. Varner, 5 Cir., 1971, 437 F.2d 1195 (concurring opinion). And although it is possible that the Court might have been able to inquire whether the granting or reneging on claimed governmental promises had anything to do with the witness's reticence, see Malloy v. Hogan, *supra*, nevertheless the record shows that the Court had ample reason impliedly to find that Maruzewski was not being recalcitrant out of spite toward the Government.

statutes grant either transactional or use immunity. The most recent discussion on these two classifications of immunity is Mr. Justice Brennan's dissent in Piccirillo v. State of New York, 1971, 400 U.S. 548, 91 S.Ct. 520, 27 L.Ed.2d 596, cert. dism'd as improvidently granted. See also, Ziccarelli v. New Jersey State Comm. of Investigation, 1971, probable jurisdiction noted, 401 U.S. 933, 91 S.Ct. 916, 28 L.Ed.2d 213 (1971) ; Sarno v. Illinois Crime Investigating Comm., 1971, cert. granted, 401 U.S. 935, 91 S.Ct.

918, 28 L.Ed.2d 214 ; The Organized Crime Control Act, 1970, 39 L.W. 23 ("use immunity") ; and Counselman v. Hitchcock, *supra* ("transactional immunity").

A judicial discussion of the history and the development of immunity as it derives from the English common law is contained in the Whiskey Cases, 1879, 99 U.S. 594, 25 L.Ed. 399.

For a collection of Federal Immunity Statutes see Comment, 72 Yale L.J. 1568 (1963).

## VI. Perjury, The Red Herring

■ Wilcox also suggests that Maruzewski had made false statements to secret service agents and that the Government knew this because it pointed out that Maruzewski "could commit perjury" were he called to testify.[10] So the argument is a dual one. First, it suggests that the Court should have explored the meaning of this remark before it could decide the propriety of the Fifth Amendment privilege. This exploration should have been an inquiry to Maruzewski to determine if this were the reason he was claiming the protection. Second, possible perjury [11] is no excuse for not testifying and will not justify the privilege. Appellant relies heavily on United States v. Orta, 5 Cir., 1958, 253 F.2d 312, to convince us that Maruzewski cannot claim the protection of the Fifth Amendment either for his alleged perjurious actions at the prior trial or out of apprehension of committing perjury at the third trial. But this obviously correct principle is so often misunderstood.

In *Orta*, the defendant was charged with having committed perjury at a grand jury investigation. During his trial he claimed that he had testified under the compulsion of a subpoena, and that he had not been advised of his constitutional rights, which was of paramount importance as he was not versed in the English language. The District Court held a hearing and suppressed Orta's grand jury testimony. This Court reversed and remanded and held that under no circumstances can a witness commit perjury and then successfully claim that the Constitution affords him protection from *prosecution for that crime*. But *Orta* most definitively does not hold that he would have been precluded from invoking the Fifth Amendment if he had been asked whether he had committed perjury at the grand jury investigation. This could be no more clearly demonstrated than in Glick-

---

10. The issue of perjury, as it is before us now, entered this case during the pretrial conference when the Court and Counsel were discussing the possible exceptions to a witness's right to invoke the privilege against self-incrimination. Wilcox argues that the following conversation expressly indicates that the Government has overtly admitted that Maruzewski did perjure himself at the first trial:

"THE COURT:
Having testified one time, I don't think he can then say, 'Well, I'm going to testify differently, and if I testify differently then I am going to be subject to prosecution for perjury. Therefore, I invoke the Fifth Amendment and refuse to testify.'
Perjury is never shielded or protected under the veil of the Fifth Amendment.

\* \* \* \* \*

\* \* \* I would normally be of the opinion that having once testified he has waived the Fifth Amendment. The cases seem to hold differently. They seem to hold that even though a witness has testified in one proceeding, if the case comes back and is retried, he has an absolute right at the next trial to invoke the Fifth Amendment. That is what I say the law is.

[DEFENSE COUNSEL]:
It isn't simply a question of the witness asserting his privilege, Judge. I have looked up some law this morning on the subject. It is not quite that simple. You have to decide whether or not there is a reasonable ground to believe that his testimony will have the tendency to incriminate him. And he has already served his time on everything that is connected with this case.
[GOVERNMENT COUNSEL]:
Except for the fact that he could commit perjury."

11. The discussion of perjury in the pretrial conference, see note 10, *supra*, is admittedly ambiguous. That is, the colloquy does not clearly show whether (i) the witness was afraid that he would perjure himself when he testified at the third trial or (ii) the witness was afraid that the testimony he gave at the third trial would show that he gave false testimony at the first trial. We assume that the Trial Judge believed that (ii) existed because his exchange with counsel shows that he realized that (i) was not a grounds for taking the Fifth Amendment. And under *Hoffman* the Judge could probably not inquire any further than he did about the tendency of the testimony to show perjury at the first trial.

stein v. United States, 1911, 222 U.S. 139, 32 S.Ct. 71, 56 L.Ed. 128 where a bankrupt, testifying under the immunity of a special section of the Bankruptcy Act, gave perjured testimony. The Court stated:

" * * * It is undoubted that the constitutional guarantee of the Fifth Amendment does not deprive the lawmaking authority of the power to compel the giving of testimony even although the testimony when given might serve to incriminate the one testifying, provided immunity be accorded, the immunity, of course, being required to be complete; that is to say, in all respects commensurate with the protection guaranteed by the constitutional limitation."

* * * * * *

" * * * [t]he sole question is, Does the statute, in compelling the giving of testimony, confer an immunity wider than that guaranteed by the Constitution?"

222 U.S. at 142, 32 S.Ct. at 73, 56 L.Ed. at 130.

The Court held that it did not, thereby establishing that special legislative immunity would not excuse a witness from prosecution for perjury which he committed while testifying to past offenses, for which acts he had been granted immunity.

■ Had the Judge made the inquiry requested, he would in effect be asking Maruzewski "Did you lie in the first trial?" An affirmative answer would clearly form a link in the chain of a possible future prosecution and it is clear therefore that the protection of the privilege was appropriate. This is different from the *Glickstein* situation, for there the witness had nothing to fear from telling the truth. He had immunity and thus no danger of incrimination when he testified. His testimony thereby was not protected. And so when a witness is asked a question that could show that he had already committed a crime, i. e., perjury at a prior trial, his refusal to answer is permissible almost by the def-

inition of self-incrimination. He is still criminally accountable for his perjury, but he may not be convicted out of his own mouth over his claim of privilege. Thus the aphorism that one cannot take the Fifth Amendment on the ground that if he testifies he will perjure himself applies only as an excuse for not testifying initially. It does not mean that having once testified, the Fifth Amendment is not available to avoid giving further testimony which might expose the witness to substantial risk of prosecutions growing out of the prior testimony.

## VII. Prior Testimony As Waiver

■ Wilcox also contends that Maruzewski's voluntary testimony at the first trial is a waiver of any claim to Fifth Amendment protection at a subsequent trial. This is simply a paraphrase of all that has gone before. In Rogers v. United States, 1950, 340 U.S. 367, 374, 71 S.Ct. 438, 442, 95 L.Ed. 344, 349, the Supreme Court observed:

"Requiring full disclosure of details after a witness freely testifies as to a criminating fact does not rest upon a further 'waiver' of the privilege against self-incrimination. Admittedly, [the witness] had already 'waived' her privilege of silence when she freely answered criminating questions * * * [but] the court was required to determine, as it must whenever the privilege is claimed, whether the question presented a reasonable danger of further crimination in light of all the circumstances, including any previous disclosures. As to each question to which a claim of privilege is directed, the court must determine whether the answer to that particular question would subject the witness to a 'real danger' of further crimination."

Although one might conclude that there was a "waiver" as to the exact words stated on the first trial, this does not eliminate the problem. For taking the stand would give the witness little control over the scope or content of ex-

amination—direct or cross. And in the circumstances of this case and the witness's life of crime, taking the stand would expose him to perils when new or different words came out.[12]

## VIII. The Myth of "Absolute Privilege"

█ Since we have decided that the witness could properly claim the Fifth Amendment privilege, we can quickly dismiss Wilcox's assertion that the Judge committed error in telling Maruzewski that he had an "absolute right" not to testify. Wilcox takes this to mean that the Judge was saying that the witness is the arbiter of the propriety of the privilege. Our reading of the proceedings however indicates that the Judge simply was speaking in colloquial terms and merely was indicating that the witness had the right to invoke the privilege any time that the Judge had determined that it was proper to do so. This of course is the correct statement of the law, and so this contention goes for naught.

## IX. Sixth Amendment Confrontation

Wilcox strenuously argues that Maruzewski cannot take the Fifth Amendment because under the Sixth Amendment Wilcox has the right to confront Maruzewski and through new evidence and cross-examination tactics to impeach his prior testimony. When the Judge permitted the prior testimony to be introduced into evidence he lost the means of destroying the effectiveness of the witness. We find that *Mobley, supra,* compels a conclusion contrary to that asserted by Wilcox on this point.

In *Mobley* a co-defendant, Oliver, pleaded guilty at both trials to charges of robbery, theft, assault, and murder. At the first trial Oliver testified for the Government, where he admitted his guilt and inculpated Mobley. At the second trial the Government again called Oliver to testify, but after having taken the witness stand, he refused to testify. Consequently the complete transcript of his former testimony was admitted into evidence and read to the jury.

Mobley claimed that the introduction of this "infected" testimony from "an antecedent trial" violated the confrontation clause of the Sixth Amendment. We held that it did not. Following our recapitulation of the testimony from the first trial, which the witness had given in great depth and detail we said:

"We find no violation here of the principles expressed in Mattox v. United States, 156 U.S. 237, 15 S.Ct. 337, 39 L.Ed. 409 (1895) and Barber v. Page, 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968), relative to the rights of an accused to confrontation and the opportunity to have a jury assess the demeanor and credibility of a witness. Both of these requirements were satisfied by the former trial, where the witness was under oath and thoroughly examined on both direct and cross-examination * * * *"

421 F.2d at 350.

" 'The substance of the constitutional protection is preserved to the pris-

---

12. Cf. United States v. Mobley, 5 Cir., 1970, 421 F.2d 345 which emphasized that no further incrimination by the witness was possible. 421 F.2d at 351 n. 5.

An analogous argument is derived from United States v. Romero, 2 Cir., 1957, 249 F.2d 371, 375 which states: "It is well established that once a witness has been convicted for the transactions in question, he is no longer able to claim the privilege of the Fifth Amendment and may be compelled to testify." This is nothing more than the truism that after one has been found guilty, all possible incrimination has passed and the privi-

lege is no longer available. Contrary to Wilcox's contention, this principle is inapplicable here. Admittedly Maruzewski pleaded guilty and was convicted of the same offense charged against Wilcox. And if the circumstances of the case showed that the only possible relevance his testimony would have would be in relation to the offenses for which he had already been convicted, then there would be no potential incrimination and thus no privilege. But as we have seen, Maruzewski has far more to fear than the offense for which the Government has won a conviction.

oner in the advantage he has once had of seeing the witness face to face, and of subjecting him to the ordeal of a cross-examination.' [Mattox v. United States, 156 U.S. 237, 15 S.Ct. 337, 39 L.Ed. 409] 156 U.S. at 243 * * * "

421 F.2d at 350.

 In *Mobley* we fully discussed the distinctions between preliminary hearings [13] and a "full fledged" trial, "at which the same counsel who had later represented appellant in the second trial, [had] fully cross-examined the witness [at the first trial] * * * " 421 F.2d at 350. Here as in *Mobley*, Maruzewski was examined and vigorously cross-examined at the first trial. The receipt of this testimony at a later trial after he subsequently took the Fifth Amendment is no violation of the confrontation clause because Maruzewski is

"[n]o less unavailable than [he would have been in instances of] death or absence from the country or physical inability to speak."

421 F.2d at 351.

## X. A Tagend

After Wilcox had rested his case, Court was recessed for lunch. Upon the Court's reconvening, the Government sought to reopen its rebuttal.[14] Accordingly, Wilcox was recalled to the witness stand, and he was asked the single question "whether or not * * * [he had] ever been convicted of a felony." Wilcox answered this question affirmatively.

Wilcox contends that, since "the evidence of guilt in this case was not overwhelming and the Trial Judge recognized the absence of strong evidence of guilt [15] * * * the * * * Judge, by allowing undue emphasis on the matter of defendant's conviction of a felony, tipped the scales of justice against the defendant and as a result thereof abused his judicial discretion."

 We do not agree. The reopening of a criminal case either to present omitted evidence or to add further testimony after either of the parties has rested is within the sound discretion of the Trial Court. Harrison v. United States, 5 Cir., 1968, 387 F.2d 614; Massey v. United States, 10 Cir., 1966, 358 F.2d 785; Lucas v. United States, 8 Cir., 1965, 343 F.2d 1. In a refreshing figure, "There is no ironbound, copper-fastened, double-riveted rule against the admission of evidence after both parties have rested upon their proof and even after the jury has entered upon its deliberations." See Jianole v. United States, 8 Cir., 1924, 299 F. 496. We are also aware—but careful not to approve or disapprove here— of the rule stated in Eason v. United States, 9 Cir., 1960, 281 F.2d 818, that " * * * reopening a case for the purpose of introducing overlooked evidence

---

13. See Barber v. Page, 1968, 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255; Pointer v. Texas, 1965, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923.

14. The following proceeding took place:
"[GOVERNMENT COUNSEL]:
At this time we move the Court for leave to reopen the defendant's case for the purpose of asking the defendant a question as to whether or not he has been convicted of a felony.
THE COURT:
You don't mean to reopen the defendant's case. What you mean is to recall the defendant for further cross-examination?
[GOVERNMENT COUNSEL]:
Yes, sir, for that purpose.

THE COURT:
All right, sir. I will grant your motion.
[DEFENSE COUNSEL]:
Your Honor, we vigorously object.
THE COURT:
I will note an objection by the defendant. The objection is overruled and the motion is granted."

15. Appellant bases this contention on the following statement made by the Court:
"Frankly, as I look at this case, I don't personally think this is a case in which the jury is going to arrive at any verdict one way or another until after there has been a considerable discussion of the evidence."

must be done with extreme reluctance because of the undue emphasis given to the introduced evidence with consequent distortion of the evidence as a whole and the possibility that such prejudice will result to the other party as to require a mistrial." 281 F.2d at 818.

There was no abuse of discretion on the part of the Trial Court here. Accordingly, this contention is devoid of merit.

Affirmed.