[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-12626
Non-Argument Calendar
_____

D.C. Docket No. 5:13-cr-00013-RS-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

VERSIAH M. TAYLOR,
TRACY L. COLLIER,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Northern District of Florida
_____

(June 21, 2016)

Before ED CARNES, Chief Judge, MARTIN and ANDERSON, Circuit Judges.

PER CURIAM:

We send criminals to prison to show them the error of their ways.  But some are not so easily deterred, and more than a few even persist in committing crimes while confined.  Tracy Collier is one.  Between September 2011 and August 2012, while locked up at Okaloosa County Correctional Facility, he and his co-conspirator, Versiah Taylor, engaged in what is known as a prison tax fraud scam.  When authorities uncovered the scheme, they charged Collier and Taylor with conspiring to defraud the government, tax fraud, wire fraud, and aggravated identity theft.  A jury convicted both men and a judge imposed substantial sentences on them.  This is their consolidated appeal.

## I.    FACTS AND PROCEDURAL HISTORY

From September 2011 through August 2012, Taylor and Collier participated in a prison tax fraud scam.  Collier, an inmate at Florida's Okaloosa County Correctional Institution, stole other inmates' personal identifying information ("identifying information") — chiefly names, birth dates, and social security numbers — and mailed it to Taylor, who was on the outside.  The defendants went to some lengths to conceal their activities.  For instance, instead of addressing his letters to Taylor, Collier often used Taylor's aliases.  Even more creatively, to sneak the stolen identifying information past prison mail screeners, Collier camouflaged it in phony legal case citations or phone numbers.  When Taylor received Collier's letters, he and his girlfriend, Joshca Hall, decoded the citations

2

and used the stolen identifying information to electronically file fraudulent tax returns and obtain tax refunds to which they were not entitled. Collier and Hall arranged for the refunds to be directly deposited on prepaid debit cards to which they had access and from which they would withdraw the funds.

Collier was not Taylor's only source of identifying information. Hall testified at trial, for example, that she and Taylor formed a sham legal research company called Pro Se Networking Assistance, LLC, and that inmates seeking the company's services sent Taylor forms containing their identifying information, which he then used to file fraudulent tax returns. Hall also testified that she and Taylor marketed to inmates the services of another phony company, called Panhandle Express; that the inmates who sought its services sent Taylor forms containing their identifying information; and that he used that identifying information to file still more fraudulent returns.

In its entirety, the scheme involved the filing of at least 76 fraudulent tax returns collectively claiming more than half a million dollars in refunds. The IRS issued $107,422 in refunds before its agents caught on. The defendants were indicted for conspiring to defraud the government, tax fraud, wire fraud, and aggravated identity theft. During their six-day trial a lot of evidence was presented against them. The government's case against Collier featured the letters he sent to Taylor containing inmates' coded identifying information; a letter from another

inmate, found in Collier's prison cell, containing "two names with info" and offering to "work something out" for "seven more"; records showing that, after the scam got underway, Taylor began making relatively large (by prison standards) deposits into Collier's prison canteen account; and the testimony of several Okaloosa inmates whose identifying information had been misappropriated in the scheme. One of the inmates, Kevin Bartley, testified that Collier asked him about filing a fraudulent tax return using his identifying information and "explain[ed] the process" of filing a false return to him. Collier moved for judgment of acquittal at the close of the prosecution's case and again at the close of the evidence, both times on the ground that there was insufficient evidence tying him to the scam. Unsurprisingly, the district court denied both motions.

The government's case against Taylor was even stronger than its case against Collier. In addition to the correspondence between the defendants, the government showed how 76 of the fraudulent returns were traceable either to internet protocol addresses affiliated with Taylor or to a red laptop seized from his office. It also established that more than 80 fraudulent returns were filed using TurboTax unique identifier numbers from the red laptop. In addition to all of that evidence, Hall testified that Taylor had orchestrated the scheme and been the one who prepared and filed the fraudulent returns from the laptop.

4

On cross-examination, Taylor tried to get Hall to testify that Taylor had been out of town and away from the office and the red laptop during April of 2012. The government objected, arguing that, because Taylor had not filed a notice of alibi, he was prohibited from presenting that testimony because it was in the nature of an alibi. Taylor argued that he was just trying to show that other people had access to the laptop while he was out of the office, but the district court sustained the government's objection and prohibited Taylor from asking Hall any more questions about Taylor's absence from the office during the period covered by the scheme. A similar issue arose later when Taylor sought to introduce testimony from his cousin, Antonio, that he and Taylor had been on vacation and away from the red laptop during some of the time when the scheme was ongoing. The government again objected that the testimony was improper alibi testimony and the district court again sustained the objection on that ground.

The defendants sought to call some witnesses who, according to the government, were at risk of incriminating themselves through their testimony. The government informed the district court, for example, that Kingston Murphy, one of the witnesses the defendants intended to call, had already given a statement to the government admitting her involvement in the tax fraud scam. In explaining why Murphy had not been prosecuted based on her statement, the government said it was not "in the [business] of charging someone when pretty much th[e]

5

predominant evidence [against them] is [their] own statement." But, the government continued, it was in the business of charging people based on testimony they gave under oath, so there was a real chance that, if she testified about the scheme, Murphy would expose herself to prosecution.

The government also named Tammy Paulette, another potential defense witness, as someone who might require advice about her Fifth Amendment rights since there was some evidence implicating her in the scam. Specifically, the government noted that a letter from Collier to Taylor had been addressed to Paulette and mailed to her home, and her home address had been used on some of the false returns filed in the scheme.

The government went through the same process for more than half-a-dozen other defense witnesses, identifying specific facts showing a reasonable likelihood of self-incrimination if they were called to testify. Based on that evidence, it asked the district court to advise those witnesses, outside the presence of the jury, of their Fifth Amendment rights. The defendants argued that such warnings were unnecessary, but the district court disagreed.

On the fifth day of trial, before the jury entered the courtroom, the district court called Paulette to the stand and fully advised her of her Fifth Amendment rights. It then asked Paulette if she still wanted to testify and she replied that she did. The jury was at that point brought into the courtroom, Taylor's lawyer

questioned Paulette about facts relating to the scam, and the government cross-examined her. At no point during her testimony did Paulette invoke her Fifth Amendment rights.

After Paulette and two other witnesses (Hall and Antonio) testified for the defendants, there was a lunch recess. Before the jury was called back into the courtroom after that recess, the district court engaged in a colloquy with Murphy similar to the one it had engaged in with Paulette.

> THE COURT: Ms. Murphy, I understand that you have been subpoenaed to come here and testify, and I want to talk to you about rights that you have. And, first, you have the right to remain silent, and anything that you do say can be used against you in court or in other proceedings.
>
> You have the right to consult an attorney before making any statement or answering any question, and you may have an attorney present with you during the questioning. You may have an attorney appointed by the U.S. magistrate or the Court to represent you if you cannot afford or otherwise obtain one.
>
> If you decide to answer questions now, with or without a lawyer, you still have the right to stop the questioning at any time, or to stop the questioning for the purpose of consulting a lawyer.
>
> However, you may waive the right to the advice of counsel, and your right to remain silent, and you may answer questions or make a statement without consulting a lawyer if you so desire. Do you understand those rights?
>
> THE WITNESS: Yes, sir.
>
> THE COURT: And are you willing to proceed now with questions and testimony?
>
> THE WITNESS: No, sir, I want to remain silent.

7

At that point, the district court asked the parties whether there was any reason the witness should not be dismissed. The parties said there was not, and the district court dismissed Murphy from further testimony.

The same day it was charged, the jury returned a verdict finding the defendants guilty on all counts. The district court entered judgment on the verdict and presentence investigation reports (PSRs) were prepared for each defendant. Two features of the PSRs are significant to these appeals. First, in calculating each defendant's total offense level under the guidelines, the PSRs added two levels because the crime involved "sophisticated means." Second, in calculating Collier's total offense level under the guidelines, his PSR added four levels because the crime involved 50 or more victims.

Both defendants objected to the PSRs' application of the "sophisticated means" enhancement. Collier also objected to application of the four-level "50 or more victims" enhancement and insisted that he was entitled to a four-level reduction in his guidelines range because he had played only a "minimal role" in the charged offenses. An addendum to the PSR for Collier responded that he was not entitled to a "minimal role" reduction because he had played a substantial part in the conspiracies.

The district court adopted the PSRs for each defendant. It sentenced Taylor to 264 months' imprisonment and Collier to 164 months' imprisonment.

8

## II.    DISCUSSION

Taylor and Collier appeal their convictions and sentences on several grounds, which we consider in turn.

### A. Taylor's Alibi Argument

Taylor sought to present the testimony of Hall and Antonio that he was on vacation for some of the time during which the scheme was taking place. The district court sustained the government's objection, which was not an abuse of discretion because the excluded testimony was in the nature of an alibi and Taylor had not timely notified the government of his intent to present an alibi defense. Federal Rule of Criminal Procedure 12.1 provides that, when the government requests that a defendant notify it of any alibi defense, a defendant who intends to rely on one must, within 14 days of the request, give the government written notice of "each specific place where the defendant claims to have been at the time of the alleged offense," as well as "the name, address, and telephone number of each alibi witness on whom the defendant intends to rely." Fed. R. Crim. Proc. 12.1(a). The rule further provides that, "[i]f a party fails to comply with this rule, the court may exclude the testimony of any undisclosed witness regarding the defendant's alibi." Fed. R. Crim. Proc. 12.1(e). The government timely requested that Taylor notify it of any intended alibi defenses, and he failed to do that.

9

Taylor argues that the excluded testimony "was simply a general denial of criminality, not an alibi defense," but his argument misapprehends the meaning of the word "alibi" and the content of the excluded testimony. An alibi is "[a] defense based on the physical impossibility of a defendant's guilt by placing the defendant in a location other than the scene of the crime at the relevant time." Alibi, BLACK'S LAW DICTIONARY (10th ed. 2014); see also United States v. White, 443 F.3d 582, 587 (7th Cir. 2006) (adopting that definition); Roper v. United States, 403 F.2d 796, 798 (5th Cir. 1968) ("[T]he essence of alibi is the impossibility of the defendant's guilt based on his physical absence from the locus of the crime."). That is the nature of the excluded testimony here. It was offered to show that Taylor did not participate in the scheme at certain times because he was somewhere else at those times. Taylor admits that he "sought to introduce testimony that he was out of town and could not have personally filed some of the returns that were submitted in April, which is the peak of 'tax season.'" That is not a "general denial of criminality," but an alibi pure and simple.

Taylor cites Robinson v. State, 57 So. 3d 278 (Fla. 4th DCA 2011), in support of his view that the excluded testimony was not in furtherance of an alibi, but that case is readily distinguishable. In that case, a witness who was present at the scene and time of the alleged crime testified that he did not see the defendant there. That was not an alibi because it suggested only that the defendant was not

10

observed by the witness at the crime scene at the relevant time; it did not purport to establish that the defendant was in another particular location at the time.

To the extent Taylor argues that excluding the testimony violates his Fifth or Sixth Amendment rights, that argument is foreclosed by our decision in United States v. Frazier, 387 F.3d 1244, 1271 (11th Cir. 2004) (en banc), where we explained that "a district court may constitutionally preclude an accused from calling an alibi witness if he has failed to disclose the witness, as required under Rule 12.1 of the Federal Rules of Criminal Procedure."

## B. Taylor and Collier's Challenge to the District Court's Advising Certain Witnesses of Their Fifth Amendment Rights

Both defendants argue that the district court violated their Fifth and Sixth Amendment rights by informing some defense witnesses of their Fifth Amendment rights before they testified. We have held that "[s]ubstantial [governmental] interference with a defense witness' free and unhampered choice to testify violates [the] due process rights of the defendant." Demps v. Wainwright, 805 F.2d 1426, 1433 (11th Cir. 1986). But a district court does not substantially interfere with a witness' choice to testify merely by instructing her about her rights and potential liabilities — at least not where it has some basis for thinking the witness might incriminate herself, and the instructions do no more than accurately state the law. See, e.g., United States v. Nunn, 525 F.2d 958, 960 (5th Cir. 1976); United States

v. Gloria, 494 F.2d 477, 484–85 (5th Cir. 1974); United States v. Wilcox, 450 F.2d 1131, 1139 (5th Cir. 1971).  That's all that happened here.

Based on facts set forth by the government, the district court reasonably concluded that some defense witnesses would be at risk of incriminating themselves if called to testify.  To ensure that they did not feel compelled to incriminate themselves — or at least knew they could avoid the risk of doing so — the district court gave them a succinct and accurate explanation of their rights.  It did not threaten, badger, or coerce them into refusing to testify.  Cf. Webb v. Texas, 409 U.S. 95, 93 S. Ct. 351 (1972) (finding violation of defendant's Sixth Amendment rights where district judge's "threatening remarks, directed only at the single witness for the defense, effectively drove that witness off the stand").  Indeed, the court closed its remarks to the witnesses with a clear and careful reminder that it was up to them whether to testify, and it is significant that Paulette showed no reluctance to testify after the court explained her rights to her.  What the district court did in this case did not violate the defendants' constitutional rights.  See Wilcox, 450 F.2d at 1139 ("Whether and to whatever extent it may be the duty of the trial judge to caution a witness about his Fifth Amendment rights, a careful one never hesitates.").  There was no abuse of discretion here.[1]

---

[1] Collier points out that the district court did not notify any government witnesses of their Fifth Amendment rights, as though that is evidence of bias by the district court.  It isn't.  No one requested that any government witness be apprised of his right not to incriminate himself.

12

### C. Taylor and Collier's Argument That the District Court Should Not Have Excused Murphy from Testifying

Both defendants argue that the district court erred in excusing witness Murphy from testifying after she invoked the Fifth Amendment, but they're wrong. The privilege against self-incrimination in the Fifth Amendment permits a person to refuse to answer questions when there is a real and substantial risk that her answers might incriminate her in future criminal proceedings. Minnesota v. Murphy, 465 U.S. 420, 426, 104 S. Ct. 1136, 1141 (1984); Marchetti v. United States, 390 U.S. 39, 53, 88 S. Ct. 697, 705 (1968). In deciding whether or how much testimony to exclude under a Fifth Amendment privilege claim, a district court must make a particularized inquiry, evaluating whether the privilege applies with respect to each area that the questioning party wishes to explore. United States v. Melchor Moreno, 536 F.2d 1042, 1049 (5th Cir. 1976). Where parts of a witness' testimony would be material and not incriminating, the defendant must be allowed to call the witness, who should be allowed to invoke the privilege "[o]nly as to genuinely threatening questions." Id. If, on the other hand, the district court reasonably finds that the witness could legitimately refuse to answer essentially all relevant questions, she may be excused from testifying altogether. United States v. Goodwin, 625 F.2d 693, 701 (5th Cir. 1980). Thus, we have upheld a district court's decision to honor a witness' blanket invocation of Fifth Amendment privilege where court had "sufficient, uncontested evidence before it [from] which

13

to find that [the witness] could plausibly fear that his answers [to the defendant's material questions] could lead to a charge of perjury." United States v. Perez, 661 F.3d 568, 580 (11th Cir. 2011).

Murphy was the only witness the defense called who invoked her right not to give self-incriminating testimony. Before advising Murphy of her right to do so, the district court made a particularized inquiry into whether there was a real and substantial risk that her answers to the questions the defendants sought to ask her could incriminate her in future proceedings. At the outset of that inquiry, the court asked the defendants whether "there [was] a possibility" that witnesses, including Murphy, would incriminate themselves. Taylor's attorney responded by acknowledging that "There is. There is." She explained that she wanted to question Murphy because "her name is on documents" integral to the conspiracy, and because certain evidence linked her to fraudulent returns that were relevant to the case. Collier's attorney told the district court that she expected that "Murphy's testimony would not be any different than what she'[d] already indicated [in her statement to the government admitting to having participated in the conspiracy], what her involvement was with this scheme as it were." Near the close of its inquiry, the district court asked Taylor's attorney: "So you want to question these people[, including Murphy,] about their involvement in an alleged fraudulent income tax refund scheme?" Taylor's attorney responded straightforwardly that

14

she did.  At no point during the discussion did either defense attorney specify a single question she wanted to ask Murphy that did not go directly to Murphy's participation in the charged conspiracy.

Murphy's out-of-court statement to the government provided "sufficient, uncontested evidence" from which the district court concluded that there was a real and substantial risk that Murphy's answers to the defendants' questions would incriminate her.  The district court properly decided that Murphy could legitimately assert the Fifth Amendment privilege in response to essentially all of the questions she would be asked, meaning it was within its discretion to excuse Murphy entirely from testifying.  Besides, defense counsel not only failed to object to dismissing Murphy but also stated there was no reason not to do so.

### D. Collier's Sufficiency of the Evidence Arguments

Collier asserts that, because the government did not introduce evidence showing that he knew how Taylor would use the stolen identifying information, the district court should have granted his motions for a judgment of acquittal on all counts.  But the government did introduce evidence that Collier knew and intended that Taylor would use the stolen identifying information to electronically file fraudulent tax returns.  For example, Bartley (an inmate at Okaloosa) testified that Collier asked him about filing a false tax return using his identifying information, and that Collier "explain[ed] the process" of filing the false return.  And IRS

Special Agent Chris Pekerol testified that Taylor started depositing money in Collier's prison canteen account after Collier began supplying him with identifying information, which is significant because "[e]vidence that a defendant personally profited from a fraud may provide circumstantial evidence of [his] intent to participate in that fraud." United States v. Naranjo, 634 F.3d 1198, 1207 (11th Cir. 2011). The evidence was sufficient to allow the jury to reasonably find that Collier knew the essential object and means of the tax fraud scheme.

Collier also contends that the government failed to prove that he, Taylor, and Hall were part of a single conspiracy. He argues that, because the government never showed that he conspired with Hall, and because it never linked him to any of the returns filed using identifying information from inmates in prisons other than the one in Okaloosa County, it should have charged at least two separate conspiracies: one between Taylor and him, and one between Taylor and Hall. But "[i]t is irrelevant that particular conspirators may not have known other conspirators or may not have participated in every stage of the conspiracy; all that the government must prove is an agreement or common purpose to violate the law and intentional joining in this goal by co-conspirators." United States v. Edouard, 485 F.3d 1324, 1347 (11th Cir. 2007). The record included evidence from which the jury could reasonably conclude that Collier had the same purpose as Taylor and Hall: to defraud the government by electronically filing fraudulent tax returns

using ill-gotten identifying information.  That shared purpose, and Collier's

agreement with the scheme's basic design, are enough to establish a single

conspiracy among Collier, Taylor, and Hall.  See United States v. Catchings, 922

F.2d 777, 781 (11th Cir. 1991).

And that is so regardless of whether Collier knew that Hall was involved in

the scheme, and regardless of whether he knew all the details of how the returns

would be filed.  As we have said, a defendant may be treated as a participant in a

single conspiracy even if he "did not know all the details of the conspiracy, and

played only a minor role; the defendant need only have known the essential

purpose of the conspiracy and have acted to further it."  Id.  Because the evidence

permitted the jury to reasonably find that Collier knew the essential purpose of the

tax fraud scheme in which Taylor and Hall participated, and to find that Collier

acted to further that purpose, the government was not required to charge more than

one conspiracy.

### E.  Taylor's "Sophisticated Means" Sentencing Challenge

Next, Taylor contends that, in calculating his sentencing range under the

advisory guidelines,[2] the district court wrongly applied the two-level "sophisticated

means" enhancement in U.S.S.G. § 2B1.1(b)(10)(C).  That enhancement applies

only when an offense involves "especially complex or especially intricate offense

---

[2] All references to the guidelines in this opinion are to the 2014 version of them, which was the version applied without objection at sentencing.

17

conduct." U.S.S.G. § 2B1.1, cmt. 9(B). To illustrate, commentary explains that a telemarketing scam involves "sophisticated means" if the main office is located in a different jurisdiction than the soliciting operations. Id. And we have affirmed a district court's application of the sophisticated means enhancement where the defendant used non-existent companies and other people's addresses to circumvent a company's discount and shipping policies. United States v. Robertson, 493 F.3d 1322, 1331–32 (11th Cir. 2007).

Taylor's conduct was substantially more complicated than that. Among other things, he: (1) collaborated with Collier in encoding stolen identifying information in fabricated case citations to conceal it from prison authorities; (2) collaborated with Hall to form a fraudulent LLC for the sole purpose of stealing more identifying information; (3) held himself out as the proprietor of another fraudulent company for the purpose of stealing yet more identifying information; and (4) used prepaid debit cards to transfer unearned tax refunds to himself. That is more than enough for application of the sophisticated means enhancement.

### F. Collier's Sentencing Arguments

Finally, Collier contends that the district court made numerous errors in calculating his range under the advisory guidelines. First, he argues that the district court erred in applying the sophisticated means enhancement to him. The Robertson case illustrates why it would have been error for the district court not to

18

apply that enhancement.  In our <u>Robertson</u> decision, we affirmed a district court's application of the sophisticated means enhancement where the defendant simply used the names of nonexistent businesses and other people's addresses to circumvent a company's policy of not shipping products to customers whose accounts were more than 30 days in arrears.  <u>Id.</u> at 1331–32.  Because Collier's conduct — using fake case citations to sneak identifying information past prison mail screeners and sending it to Taylor using Taylor's various aliases — was at least as sophisticated as the conduct in <u>Robertson</u>, the district court properly applied the sophisticated means enhancement here.

Collier's next argument is that the district court should not have applied a four-level enhancement under U.S.S.G. § 2B1.1(b)(2), which covers offenses that "involved 50 or more victims."  When, as here, a crime involves "means of identification," the class of "victims" includes "any person who sustained any part of the actual loss" from an offense, "any individual who sustained bodily injury as a result of the offense," and "anyone whose identity is "used unlawfully or without authority."  <u>See</u> U.S.S.G. § 2B1.1 cmt. n. 1, 4(E).  We have held that a person's identity is not "used unlawfully or without authority" if it is merely possessed, transferred, or sold unlawfully, and for purposes of § 2B1.1, unlawful or unauthorized use requires "actual use" for an illicit purpose.  <u>See</u> <u>United States v. Hall</u>, 704 F.3d 1317, 1323 (11th Cir. 2013).

19

The conspiracy in this case affected at least 61 victims.  Collier, however, is not necessarily accountable for all of them, at least for sentencing purposes.  A participant in a conspiracy is accountable at sentencing for his own acts and omissions in furtherance of the conspiracy, U.S.S.G. § 1B1.3(a)(1)(A), and also for his co-conspirators' acts and omissions that were "reasonably foreseeable" and done "in furtherance of the jointly undertaken criminal activity," id. § 1B1.3(a)(1)(B); see United States v. Baldwin, 774 F.3d 711, 730 (11th Cir. 2014).  Thus, before attributing a co-conspirator's conduct to a defendant at sentencing, the court must "determine the scope of criminal activity the defendant agreed to jointly undertake, and then consider all reasonably foreseeable acts and omissions of others in the jointly undertaken criminal activity."  United States v. McCrimmon, 362 F.3d 725, 731 (11th Cir. 2004); see U.S.S.G. § 1B1.3, cmt. n. 2. To do that, the court must make individualized findings, based on reliable evidence, about: (1) the scope of the defendant's agreement with the co-conspirator; and (2) the foreseeability of the co-conspirator's conduct.  See United States v. Isaacson, 752 F.3d 1291, 1305 (11th Cir. 2014).  Findings about the scope of the conspiracy as a whole are not sufficient for that purpose because, while a co-conspirator is often criminally liable for all of the acts done in furtherance of a conspiracy, "[t]he limits of sentencing accountability are not coextensive with the scope of criminal liability."  United States v. Hunter, 323 F.3d 1314, 1319 (11th

Cir. 2003).  Put differently, "the defendant's sentence can only be enhanced by those reasonably foreseeable losses caused by co-conspirators acting in furtherance of the part of the conspiracy in which the defendant agreed to participate." Isaacson, 752 F.3d at 1305.

In light of those principles, we have no trouble concluding that the district court misapplied the guidelines in applying the "50 or more victims" enhancement in § 2B1.1(b)(2) to Collier.  For starters, the record establishes that there are just seven "victims" of Collier's own conduct.  That is because, even though he stole identifying information from dozens of inmates, Taylor only filed seven fraudulent returns using the identifying information Collier supplied.  The government admitted as much at sentencing.  As a result, the only basis for applying the 50-or-more-victims enhancement to Collier would be if he was vicariously accountable for most of the returns Taylor filed using identifying information from other sources.  Attributing Taylor's conduct to Collier requires individualized findings about the scope of Collier's agreement with Taylor, and about the foreseeability of Taylor's conduct.  The district court did not make those findings.  Instead, it appears to have sentenced Collier based on the PSR, which itself considered only the conspiracy as a whole.  That was error and, because there is nothing in the record from which we may infer that the error was harmless, we must vacate and remand Collier's case for resentencing.  See United States v. Keene, 470 F.3d

21

1347, 1348–50 (11th Cir. 2006).  We do not say whether the "50 or more victims" enhancement in § 2B1.1(b)(2) should apply to Collier at resentencing; only that, in determining whether to apply it, the district court must properly make the individualized findings required by § 1B1.3(a)(1)(B).

Collier's last guidelines argument is that the district court should have reduced his total offense level because he was only a minimal or minor participant in the scheme.  See U.S.S.G. §§ 3B1.2(a) (providing that, if defendant is a minimal participant, court should reduce his total offense level by four); 3B1.2(b) (providing that, if defendant is a minor participant, court should reduce his total offense level by two).  Whether he is right about that depends on how his role in the scheme compares to "the relevant conduct for which [he] has been held accountable at sentencing" as well as his "role as compared to that of other participants in [his] relevant conduct."  United States v. Rodriguez De Varon, 175 F.3d 930, 940 (11th Cir. 1999) (en banc).  At sentencing in this case, the district court failed to consider Collier's role in the scheme, meaning it cannot have properly decided whether he was entitled to a minor or minimal participant reduction under the guidelines.  On remand, the district court should do so and then decide about the minor or minimal role reductions.  Id.  It need not state or set out the specific facts that ultimately cause it to apply or not apply the reductions, see id., although that is usually the better practice, see United States v. West, 898 F.2d

22

1493, 1503–04 (11th Cir. 1990).  What is important is that the district court take care to ascertain and compare the scope of Collier's conduct in the scheme and the scope of the conduct for which he is properly accountable under U.S.S.G. § 1B1.3(a).

Versiah Taylor's conviction and sentence are **AFFIRMED**.  Tracy Collier's conviction is **AFFIRMED**, his sentence is **VACATED**, and his case is **REMANDED** to the district court for resentencing consistent with this opinion.