

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-14-2007

# USA v. Hugh

Precedential or Non-Precedential: Non-Precedential

Docket No. 05-4260

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"USA v. Hugh" (2007). *2007 Decisions.* Paper 943.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/943

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

IN THE UNITED STATES COURT
OF APPEALS
FOR THE THIRD CIRCUIT

———————

NO. 05-4260

———————

UNITED STATES OF AMERICA

v.

NOLAN HUGH
Appellant

———————

On Appeal From the United States
District Court
For the Eastern District of Pennsylvania
(D.C. Crim. Action No. 03-cr-00829)
District Judge:  Hon. Harvey Bartle, III

———————

Argued January 17, 2007

BEFORE:  McKEE, AMBRO and STAPLETON
Circuit Judges

(Opinion Filed   June 14, 2007 )

———————

Patrick L. Meehan
United States Attorney
Robert A. Zauzmer
Assistant U.S. Attorney

Jennifer A. Williams (Argued)
Paul G. Shapiro
Assistant U.S. Attorney
615 Chestnut Street
Philadelphia, PA 19106
 Attorneys for Appellee

Maureen K. Rowley
Chief Federal Defender
David L. McColgin
Assistant Federal Defender
Robert Epstein (Argued)
Assistant Federal Defender
601 Walnut Street
The Curtis Center - Suite 540 West
Philadelphia, PA 19106
 Attorneys for Appellant

―――――――

OPINION OF THE COURT

―――――――

STAPLETON, Circuit Judge:

Appellant Nolan Hugh was convicted by a jury of conspiracy to interfere with

interstate commerce by robbery, interference with interstate commerce by robbery, and

using a gun during a crime of violence. He was sentenced to 180 months of

imprisonment, and this appeal followed. We will affirm.

The teller at the check cashing store that was robbed by two men testified for the

2

government. On direct, she gave a detailed account of the robbery itself and of her subsequent identification of Hugh in a police photo spread as the "second robber"—the robber who had stopped by the store two hours before he reappeared during the robbery. She said, among other things, that Hugh had asked for change for a $5 bill when he first came to the store. On cross-examination, defense counsel showed her a two-page police "Investigation Interview" she had given to the police on the day of the robbery and asked if she did not there say she could not remember why Hugh had first come to the store. The witness acknowledged the conflict. The two-page interview, which in response to questions from an investigating officer provided an account of the entire robbery episode, had been marked Defendant's Exhibit D-1-A for identification (hereafter "D-1-A").[1] Its contents had not been referred to earlier in the trial. Although the investigating officer testified in response to questions from defense counsel that he prepared a report of the interview, the contents of that report were not subsequently referred to in the testimony. D-1-A was never offered into evidence.

During his closing argument, defense counsel, in the course of arguing that the photo spread had been unduly suggestive, informed the jury that the teller in her interview on the day of the robbery had described the second robber as having a "Muslim type beard."

---

[1]The second page of the record of the interview was marked Defendant's Exhibit D-1-B for identification. However, the entire exhibit for identification will be referred to herein as "D-1-A."

3

Following the Court's charge to the jury, defense counsel asked that D-1-A and another document be sent out to the jury room with the jury. The government pointed out that they had not been moved into evidence and that, if they had been, the government would have been objected to their admission as hearsay. The Court declined to send the exhibits out with the jury, stating: "[T]hey were not moved into evidence. So they will not go out." App. at 528.

After the jury retired and the Court returned from a recess, it further explained to defense counsel why D-1-A was hearsay:

> The other document is D-1A, which is called an Investigation Interview Record dated May 24, '03, which is a series of questions put to Alyia Hason, and her answers, which were typed up by the detective and signed by Ms. Hason. That, of course, was a statement made by a witness, other than while testifying here at the trial or hearing. This does not come within the exception set forth in rule 801[(d)], which defines statements which are not hearsay. And while under certain circumstances prior statements of witnesses may be admitted into the record, and are not deemed to be hearsay, this document does not come within the definitions set forth in 801[(d)(1)].[2]

---

[2]Federal Rules of Evidence 801(c) and 801(d)(1) provide as follows:

> (c) Hearsay. "Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.
> (d) Statements which are not hearsay. A statement is not hearsay if –
>> (1) Prior statement by witness. The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (A) inconsistent with the declarant's testimony, and was given under oath subject to the penalty of perjury at a trial, hearing,

First of all, it doesn't come within rule 801[(d)(1)(A)], since it is not given under oath. It does not come within the definition of 801[(d)(1)(B)] because it's not being offered as a statement consistent with the declarant's testimony, and it is not offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive.

And again, neither of these documents comes within any exception of the hearsay rule. So therefore, again, while this document was used for impeachment purposes during the examination of Ms. Hason, it's not substantive evidence and will not be admitted.

App. at 530-31.

After reaffirming its ruling that the statement was not admissible as "substantive evidence," the Court added that "even if it's somehow admissible at this point, I think by sending it out to the jury would give undue weight to that statement." App. at 532.

At some point during the Court's discussion of this issue with counsel, the jury sent a note to the Court requesting that it be provided with a copy of D-1-A and a police investigation report of the robbery. The Court responded:

Members of the jury, under our rules of evidence, I will not be able to send those statements out with you, and you're just going to have to remember the testimony that was given during the trial, and of course the demonstrative exhibits that you have. Thank you.

App. at 532-33.

Before us, Hugh insists that the District Court abused its discretion by not

---

or other proceeding, or in a deposition, or (B) consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive, or (C) one of identification of a person made after perceiving the person; . . .

5

reopening the evidence, admitting D-1-A, and sending it out to the jury. We find no abuse.

First, as the foregoing account indicates, the defense failed to offer D-1-A into evidence and did not provide an excuse for not doing so. As a result, with one minor exception regarding the teller's memory of the pretext for the second robber's initial appearance, the significance of the contents of that two page document was something that the government had no occasion to address through testimony, exhibits, or comments of counsel in closing. In a letter to the court, the defense calls our attention to several cases in which courts of appeals have affirmed the decision of a district court to reopen the record in a case after both parties had rested. *See United States v. Boone*, 437 F.3d 829, 837 (8th Cir. 2006); *Duong v. McGrath*, 128 Fed. Appx. 32, 34 (9th Cir. 2005) (non-precedential); *United States v. Ramirez-Gonzales*, 116 Fed. Appx. 369, 372 (3d Cir. 2004) (non-precedential); *United States v. Mojica-Baez*, 229 F.3d 292, 300 (1st Cir. 2000); *United States v. Wilcox*, 450 F.2d 1131, 1144 (5th Cir. 1971); *United States v. Schartner*, 426 F.2d 470, 475 (3d Cir. 1970); *United States v. Duran*, 411 F.2d 275, 277 (5th Cir. 1969) In none of those cases, however, did the court of appeals grant what Hugh asks from this court—a decision *reversing* the district court's decision *not* to reopen a case. There is good reason for this. Our precedents and those of other courts of appeals—including those that Hugh cites to us—have consistently held that a district court enjoys broad discretion regarding whether to reopen the record. *Boone*, 437 F.3d at

836; *United States v. Coward*, 296 F.3d 176, 180 (3d Cir. 2002) (drawing an analogy between reopening a trial record after the parties have rested and reopening the record of a suppression hearing on remand); *United States v. Blankenship*, 775 F.2d 735, 741 (6th Cir. 1985); *Wilcox*, 450 F.2d at 1143; *Duran*, 411 F.2d at 277. We have also cautioned "that courts should be extremely reluctant to grant reopenings." *Coward*, 296 F.3d at 180 (quoting *United States v. Kithcart*, 218 F.3d 213, 219 (3d Cir. 2000)); *Wilcox*, 450 F.2d at 1143-44. Under the circumstances of this case, where the defense offered no excuse for failing to move the exhibit into evidence and the prosecution had no occasion to address it,[3] we cannot say that the district court abused its discretion by not admitting it at the late stage at which it was offered.

Second, we perceive no error in the District Court's ruling that D-1-A was inadmissible hearsay. When the defense finally focused the Court's attention on its desire to get D-1-A to the jury, at no point did it offer less than the entire exhibit and at no point did it refer the Court to the two rules of evidence it now relies upon to support D-1-A's admissibility. This is important because it is clear from the record that the Court understood the defense to be seeking to get the entire statement before the jury. From this perspective, it is clear both that the granting of this request would have involved the

---

[3] We have admonished prosecutors for commenting during closing argument on facts not in evidence, including exhibits marked for identification but not entered into evidence. *Gov't of Virgin Islands v. Rosa*, 699 F.2d 121, 125-26 (3d Cir. 1983); *United States v. Newman*, 490 F.2d 139, 147 (3d Cir. 1974); *United States v. LeFevre*, 483 F.2d 477, 479-80 (3d Cir. 1973).

7

admission of hearsay and that neither of the now cited rules were relevant.

D-1-A consists of a detective's two-page account of what he understood the teller to be saying as he questioned her about her experience on the day of the robbery. It is clearly hearsay as defined in Fed. R. Evid. 801(c) and clearly does not come within any of the three exceptions carved out by Rules 801(d)(1)(A), (B) or (C). As the District Court observed, D-1-A did not come within the scope of (A) because it was not given under oath or (B) because it was not offered as a prior consistent statement. While Hugh now insists that D-1-A was admissible under (C), only one answer to one question in this two-page document can fairly be characterized as a statement "of identification of a person made after perceiving the person."[4] *See United States v. Brink*, 39 F.3d 419, 424-26 (3d Cir. 1994). Given the failure to call this single answer or Rule 801(d)(1)(C) to the Court's attention, we cannot fault the Court for viewing D-1-A as hearsay.

The other rule relied upon before us for the first time is Rule 612 relating to writings "Used to Refresh Memory."[5] Hugh insists that the teller acknowledged

---

[4]The teller's answer to a request for a description of the "second male" was as follows:
> He was short. He was about 5'5 and a darker brown skin. He had a mustache and a Muslim type beard. He was wearing a dark colored windbreaker with a yellow shirt underneath with some black printing on it. He was wearing loose pants. They were dark colored, either khakis or jeans. He was also thin. He was younger, between 30-35.

App. at 541.

[5]Federal Rule of Evidence 612 provides:
> Except as otherwise provided in criminal proceedings by section 3500 of title 18, United States Code, if a witness uses a writing to refresh memory for the purpose of testifying, either –

8

reviewing D-1-A the day before she testified "to prepare for testifying" and, accordingly, that it "could be admitted . . . in its entirety under Rule 612(2)." Br. Appellant at 30. It is not at all clear to us that the teller acknowledged using D-1-A to refresh her recollection,[6] but we assume for present purposes that she did.

Because D-1-A was not offered under Rule 612, the District Court never had the opportunity to exercise its discretion regarding the "interests of justice" and, for that reason alone, we would be reluctant to find that it had abused its discretion. Even if the Court's attention had been called to Rule 612 and it had declined to let D-1-A go to the

>     (1) while testifying, or
>     (2) before testifying, if the court in its discretion determines it is necessary in the interests of justice,
> an adverse party is entitled to have the writing produced at the hearing, to inspect it, to cross-examine the witness thereon, and to introduce in evidence those portions which relate to the testimony of the witness. If it is claimed that the writing contains matters not related to the subject matter of the testimony the court shall examine the writing in camera, excise any portions not so related, and order delivery of the remainder to the party entitled thereto. Any portion withheld over objections shall be preserved and made available to the appellate court in the event of an appeal. If a writing is not produced or delivered pursuant to order under this rule, the court shall make any order justice requires, except that in criminal cases when the prosecution elects not to comply, the order shall be one striking the testimony or, if the court in its discretion determines that the interests of justice so require, declaring a mistrial.

[6] The record reflects that the prosecutor gave the witness documents to review and that she read "not all of them, but . . . a few on Thursday." App. at 216. The teller's statement that she thought she reviewed "the paper you just had here . . . yesterday morning," App. at 217, may or may not be a reference to D-1-A. Because it was never referred to Rule 612, however, the District Court had no occasion to determine whether the witness did or did not refresh her recollection with D-1-A before trial.

jury, however, we still would not find abuse. What the defense wished to get before the jury from D-1-A was the description of the second robber given by the teller to the police on the day of the robbery. As Hugh's brief before us explains, "[W]hile defense counsel accurately referred to the document during closing argument – that Ms. Hason described robber 2 as having a Muslim beard – counsel's statement could not be considered as evidence of that fact by the jury." Br. Appellant at 31. Rule 612 was not an appropriate vehicle, however, to remedy this situation.

Rule 612 provides for the introduction of a writing used to refresh memory prior to trial at the court's discretion because the "power of suggestion embodied in a writing can create a false memory," which the witness may be "unable to distinguish from that based on actual perception." 28 Charles Alan Wright & Victor James Gold, *Federal Practice & Procedure* § 6182, at 443-44 (1993). Accordingly, the right conferred by Rule 612 "'to introduce in evidence those portions which relate to the testimony of the witness' . . . simply means the writing may be admitted on the question of the witness' credibility and is not thereby made admissible for other purposes. If offered for some other purpose, different rules would be applicable, such as those regulating hearsay and the use of copies." 28 *id.* § 6183, at 455-56.

Had the District Court been referred to Rule 612 and advised of why it was being offered, the denial of the application would not have been an abuse of discretion. D-1-A was not being offered to show that anything the teller had testified to had been influenced

10

by her refreshing her recollection with the description of the second robber. Rather, it was being offered as "substantive evidence,"in the Court's words, – i.e., offered for the truth of the detective's report that the teller described the second robber as having a "Muslim beard." If the defense wished to argue, as counsel did in closing, that the police had structured the photo spread so that only one individual would fit the description given by the teller, defense counsel had a full opportunity to secure competent evidence of the teller's description from the teller and from the detective who also testified. D-1-A when offered for this purpose, however, was hearsay.

Having concluded that the District Court did not abuse its discretion in finding D-1-A inadmissible when and as offered to it, we find it unnecessary to address Hugh's challenge to the District Court's ruling that if D-1-A were admissible it should nevertheless not be given to the jury because of the potential for it being given undue weight.

The judgment of the District Court will be affirmed.[7]

_____

[7]Appellant's brief also suggests for the first time that D-1-A should have gone to the jury under the authority of Rule 613(b) pertaining to conditions for the admissibility of prior inconsistent statements. The only referenced inconsistent statement in D-1-A is the teller's statement that she did not remember the pretext for the second robber's initial visit which is said to conflict with her testimony that she now remembers he was asking for $5.00 in change. Even if the defense had cited this rule and offered only the single sentence of D-1-A, i.e., "I don't remember what he asked for, but he didn't cash a check," we would find no abuse in declining to reopen the record for such an inconsequential matter, particularly since the teller acknowledged the conflict.

11

_____

AMBRO, Circuit Judge, dissenting.

Two men robbed a store. The single eyewitness, Alyia Z. Hasan, gave police a statement in which she described one of the robbers as having "nice hair" and a "Muslim-type beard." Attempting to determine the identity of this robber, the police later presented Hasan with a photographic "line-up" that appeared to include only two or three individuals fitting the description she earlier gave. At trial, largely based on deficiencies in the suggestive line-up, defense counsel vigorously challenged whether the defendant, Nolan Hugh, was one of the robbers. By mistake, the form on which Hasan's description of the robbers was recorded, marked as exhibit D-1-A, was not introduced in evidence; however, it was extensively referenced—without Government objection—during defense counsel's closing argument. Soon after the jury retired to deliberate and the physical evidence was assembled for its review, the parties discovered the error. As one might expect, defense counsel moved to reopen the record so that exhibit D-1-A could be introduced in evidence and sent to the jury. The District Court denied the motion, ruling that admitting it would invite the jury to give it "undue weight." During deliberations, the jury specifically requested to see exhibit D-1-A, but the District Court refused. I believe that this was reversible error. By ruling otherwise, and with citation to almost none of the relevant law, the majority makes abuse-of-discretion review tantamount to no review at

12

all.  I respectfully dissent.

## I.  The Legal Framework

Despite the impression one might get from the majority opinion, "[t]here is no iron-bound, copper-fastened, double-riveted rule against the admission of evidence after both parties have rested upon their proof and even after the jury has entered upon its deliberations."  *United States v. Blankenship*, 775 F.2d 735, 741 (6th Cir. 1985); *see, e.g.*, *Dibella v. Hopkins*, 403 F.3d 102 (2d Cir. 2005) (affirming district court's grant of a motion to reopen); *United States v. Smith*, 42 F.3d 1404 (9th Cir. 1994) (table decision), *text at* 1994 WL 680999 (same); *United States v. Green*, 757 F.2d 116 (7th Cir. 1985) (same); *United States v. Carter*, 569 F.2d 801 (4th Cir. 1977) (same); *Mo. Pac. Ry. Co. v. Oleson*, 213 F. 329 (8th Cir. 1914) (same); *Alaska United Gold Mining Co. v. Keating*, 116 F. 561 (9th Cir. 1902) (same); *Commercial Travelers' Mut. Acc. Ass'n v. Fulton*, 93 F. 621 (2d Cir. 1899) (same).  Our only task, therefore, is to determine whether the District Court abused its discretion in refusing to allow Hugh to do so in the context of this case.  *Anzano v. Metro. Life Ins. Co.*, 118 F.2d 430, 435 (3d Cir. 1941).  And though the majority chides Hugh for failing to cite cases that "grant[ed] what [he] asks from this [C]ourt—a decision *reversing* the [D]istrict [C]ourt's decision *not* to reopen a case," Maj. Op. at 6 (emphasis in original), it is clear that such cases do exist, *see, e.g.*, *United States v. Parker*, 73 F.3d 48 (5th Cir. 1996), *vacated and reh'g en banc granted*, 80 F.3d 1042 (5th Cir. 1996) (*en banc*), *reinstated in relevant part*, 104 F.3d 72 (5th Cir. 1997) (*en*

13

*banc*); *United States v. Walker*, 772 F.2d 1172 (5th Cir. 1985); *United States v. Larson*,

596 F.2d 759 (8th Cir. 1979).[8]

The framework for analyzing questions of this sort is well-stated in *United States v. Thetford*:

> In exercising its discretion [when deciding whether to reopen the record], the court must consider the timeliness of the motion, the character of the testimony, and the effect of the granting of the motion. The party moving to reopen should provide a reasonable explanation for the failure to present the evidence in its case-in-chief. The evidence proffered should be relevant, admissible, technically adequate, and helpful to the jury in ascertaining the guilt or innocence of the accused. The belated receipt of such testimony should not "imbue the evidence with distorted importance, prejudice the opposing party's case, or preclude an adversary from having an adequate opportunity to meet the additional evidence offered."

676 F.2d 170, 182 (5th Cir. 1982) (quoting *Larson*, 596 F.2d at 778).[9] "The most

---

[8]In substantively addressing this statement by the majority, I perhaps give it more treatment than it deserves. All that the majority accomplishes by it is to set up and then knock down a strawman. The real story is this: shortly before oral argument, Hugh submitted a letter to our Court pursuant to Federal Rule of Appellate Procedure 28(j) that cited several cases in which the Government had been allowed to reopen the record after it had rested its case. He did this in order to rebut the Government's argument that the District Court's decision should be affirmed *solely* because exhibit D-1-A was not moved in evidence before Hugh had rested his defense. To the contrary, argued Hugh, the cases "clearly demonstrate" that exhibit D-1-A "was not, as a matter of law, inadmissible because of defense counsel's mistake in failing to move earlier for its admission." Nothing in Hugh's supplemental submission purports to bolster his primary argument that it was an abuse of discretion for the District Court not to reopen the record. That argument, instead, is appropriately made in his opening brief, and the majority's faulting him for not also including it in a Rule 28(j) letter is somewhat odd.

[9]We have approved this framework for use in the "analogous" context of whether to allow additional evidence after a reversal and remand of the denial of a motion to suppress. *See United States v. Kithcart*, 218 F.3d 213 (3d Cir. 2000); *United States v. Vastola*, 915 F.2d 865 (3d Cir. 1990). Both *Kithcart* and *Vastola* cited *Blankenship*,

14

important consideration is whether the opposing party is prejudiced by reopening." *Blankenship*, 775 F.2d at 741. Naturally, the later in the proceedings the motion is made, the more likely that the non-moving party will be prejudiced. *See id.* To repeat, though, "[m]otions to reopen have been granted after both parties have rested." *Larson*, 596 F.2d at 778 (citing *United States v. Barker*, 542 F.2d 479 (8th Cir. 1976)); *see Dibella*, 403 F.3d at 119–21 (reopening the record during closing arguments); *Smith*, 1994 WL 680999, at *1 (admitting items "[a]fter the close of evidence"); *Walker*, 772 F.2d at 1177 (reopening the Government's case-in-chief after both sides had rested); *Keating*, 116 F. at 565 (introducing "further evidence after both the plaintiff and defendant had announced that the case was closed"). Additionally, and particularly pertinent to this case, "[r]eopening is often permitted to supply some technical requirement . . . [or] some detail overlooked by inadvertence." *Blankenship*, 775 F.2d at 740.

## II. Applying the Legal Framework

The majority offers only two explicit reasons for finding no abuse of discretion in this case: (1) Hugh did not offer exhibit D-1-A in evidence before resting his defense case, *see* Maj. Op. at 6–7; and (2) exhibit D-1-A is inadmissible in any event, *see* Maj. Op. at 7–11. As to the first reason, I agree. But so what? The very purpose of a motion to reopen the record is to admit evidence not previously admitted. If the majority's point were valid, no motion to reopen should *ever* be granted. That, of course, cannot be the

which in turn cited *Thetford* and *Larson*.

15

case, and the majority's argument in this regard, therefore, needs no further response.  As for the majority's second reason, I address it in Part II.A immediately below.  In capsule form, the portion of exhibit D-1-A giving Hasan's description of the robbers is admissible, and the majority ultimately acknowledges this.  In Parts II.B–D, I go on to address other factors relevant to the decision whether to reopen, as admissibility is not by itself sufficient to justify reopening the record.

A.      Admissibility

The majority finds "no error in the District Court's ruling that [exhibit] D-1-A was inadmissible hearsay."  Maj. Op. at 7.  I disagree, for it is hornbook law that the portion of exhibit D-1-A giving Hasan's description of the two robbers, including reference to one as having "nice hair" and a "Muslim-type beard," is not hearsay and is therefore admissible.  *See* FED. R. EVID. 801(d)(1)(C) ("A statement is not hearsay if . . . [t]he declarant testifies at the trial . . . and is subject to cross-examination concerning the statement, and the statement is . . . one of identification of a person made after perceiving the person . . . ."); *United States v. Brink*, 39 F.3d 419, 424–26 (3d Cir. 1994); MCCORMICK ON EVIDENCE § 251, at 385–86 (John W. Strong *et al.*, eds., 5th ed. 1999).  The majority admits as much.  *See* Maj. Op. at 8 ("[O]nly one answer to one question in [exhibit D-1-A] can fairly be characterized as a statement [of prior identification].").

For our purposes, the discussion on admissibility should end there.  But instead, the bulk of the majority's discussion attempts to explain why Hugh effectively waived

16

any claim to the admissibility of exhibit D-1-A by defense counsel's "failure to call this single answer or Rule 801(d)(1)(C) to the [District] Court's attention." Maj. Op. at 8. There are several problems I have with this analysis, not the least of which is the questionable relevance of a waiver-type argument in the first place. The alleged error in this case is not so much about admissibility, but rather the District Court's refusal to reopen the record. Our review, therefore, is not the same as when we consider typical evidentiary rulings as to admissibility, where a defendant's waiver triggers plain error review. Instead, we review here for an abuse of discretion in the denial of a motion to reopen the record, in which the only requirement at this step of the analysis is that the exhibit be admissible in the abstract. Concerns over timeliness and the adequacy of counsel's advocacy are addressed by other factors set out in *Thetford* and *Larson*. Waiver, therefore, cannot have a determinative effect on a decision of this nature, and the majority errs in concluding otherwise.

But even the majority's waiver-of-admissibility argument has problems. First, the District Court did not rest its decision refusing to reopen the record on exhibit D-1-A's supposed inadmissibility. Instead, when defense counsel asked the Court, "On what ruling, Your Honor, because they're hearsay, or because they were never submitted?", it replied, "I think the jury understands the statements, and I think . . . it gives undue weight to [the] statements, even assuming that they are otherwise admissible." That this concern formed the basis of the Court's ruling was confirmed later when the jury specifically

17

requested to see exhibit D-1-A and a lengthy discussion between the Court and counsel

ensued.  Concluding that discussion, the Court ruled:

> [Exhibit D-1-A is] not substantive evidence, and even if . . . it's somehow
> admissible at this point, I think by sending it out to the jury it would give
> undue weight to that statement.  The jury needs to consider everything [Ms.
> Hasan] said on the witness stand, and it's their recollection of what she said
> that's important.  And I would not send it out with the jury, even if
> somehow it were admissible as substantive evidence.

In short, the majority hardly can fault Hugh for failing to raise Rule 801(d)(1)(C) when it

would not have made a difference in the Court's decision.

Second, when the Court and counsel did finally wrestle with the hearsay

issue—only *after* the denial of the motion to reopen and after the jury's request to see

exhibit D-1-A—the Court concluded as follows:

> [Exhibit D-1-A] does not come within the exception set forth in rule 801(d),
> which defines statements which are not hearsay.  And while under certain
> circumstances prior statements of witnesses may be admitted into the
> record, and are not deemed to be hearsay, this document does not come
> within the definitions set forth in 801(d)(1).
>     First of all, it doesn't come within rule 801(d)(1)(A), since it is not
> given under oath.  It does not come within the definition of 801(d)(1)(B)
> because it's not being offered as a statement consistent with the declarant's
> testimony, and it is not offered to rebut an express or implied charge against
> the declarant of recent fabrication or improper influence or motive.

The analysis inexplicably stops there.  After having addressed Rule 801(d)(1)(A) and

801(d)(1)(B), the Court never took the next logical step and considered Rule

801(d)(1)(C)—*even though that is clearly the applicable provision*.  It is true that Hugh

never specifically raised Rule 801(d)(1)(C), but neither was he required to do so under

18

our precedent. *See Brink*, 39 F.3d at 425 (holding it sufficient merely to argue that "'under the federal rules [a statement] is not hearsay.' . . . Although [the defendant] did not mention Rule 801(d)(1)(C) expressly, his objection was sufficiently specific to inform the district court."). The question whether exhibit D-1-A contained hearsay was presented to and addressed by the District Court. That is all that is required.

Finally, the majority faults Hugh for attempting to admit the entirety of exhibit D-1-A (a two-page document) rather than just the small portion comprising Hasan's description of the robbers. *See* Maj. Op. at 7–8. Even if the majority is correct that the entire exhibit is not admissible,[10] Hugh's primary concern was whether the portion containing the description was introduced. The only reason his counsel discussed exhibit D-1-A in his closing at all was to implore the jury to compare the photographic line-up with the description Hasan gave to the police, and thereby conclude that the line-up was

---

[10]Federal Rule of Evidence 612 permits the introduction of writings used to refresh a witness's recollection in preparing to testify. *See* FED. R. EVID. 612(2). The majority suggests that writings may be introduced under Rule 612 only in order to call into question a witness's credibility. *See* Maj. Op. at 10–11. If the preliminary draft of the Federal Rules had been adopted, the majority would be correct; it provided that such evidence is admissible "for the purpose of affecting [a witness's] credibility." The revised draft, however, omitted that phrase. This revision did spawn concerns with the apparent broadening of the Rule, but they related only to issues pertaining to privilege and the Jencks Act and were dealt with in the Advisory Committee's Notes. In any event, those concerns are irrelevant here. *See* 28 CHARLES ALAN WRIGHT & VICTOR JAMES GOLD, FEDERAL PRACTICE AND PROCEDURE, § 6181, at 432–42 (1993). Rather than being limited to questions of credibility, the drafting history and text of Rule 612 instead strongly suggest that it is applicable in cases such as this and, therefore, that the entirety of exhibit D-1-A is admissible.

too suggestive to credit Hasan's identification of Hugh. If the District Court's concern were truly with inadmissible hearsay portions of the document, there is no reason why the document could not have been redacted.[11]

In sum, I conclude (as does the majority) that the relevant portion of exhibit D-1-A is admissible. It thus becomes necessary to consider other factors, such as the character of the evidence proffered, counsel's excuse for failing to introduce it in a timely manner, and the prejudice that might have resulted from its untimely admission. I address these factors in the sections that follow.

B.     Character of the Evidence

When evaluating the character of the proffered evidence, courts should consider the practical problems (*e.g.*, disruptiveness to the trial) that may result in granting a motion to reopen, as well as what effect it would have on the entire case. *See, e.g.*, *Walker*, 772 F.2d at 1178–79. Here, both considerations weighed in favor of Hugh's motion to reopen.

First, the practical implications of reopening the record in this case were virtually nil. Exhibit D-1-A had already been authenticated and could have been moved in

---

[11]The majority would presumably fault Hugh as well for not raising redaction as a possible solution. The simple response, as explained earlier, is that the District Court did not base its ruling on D-1-A's supposed hearsay character, but rather that the jury would give it "undue weight." Redaction, of course, would not cure that supposed infirmity, and Hugh should not be faulted for failing to mention it. Moreover, district courts should not need the assistance of counsel to suggest that a document be redacted to exclude inadmissible hearsay—an easy and obvious remedy in situations like this.

evidence in a matter of seconds—and certainly in a shorter amount of time than the District Court spent concluding that an admissible document would not be admitted by reopening the record. The situation here (involving a single additional *document*) is similar in character to that presented in *Smith*, *see* 1994 WL 680999, at *1 (allowing gift certificates to be admitted after the close of evidence), or *Dibella*, *see* 403 F.3d at 119 (reopening the record to introduce a time-sheet). Moreover, admitting exhibit D-1-A would have been less disruptive than reopening the record for additional *testimony*, which other courts have allowed. *See, e.g.*, *Blankenship*, 775 F.2d at 738, 741 (admitting the testimony of three additional witnesses); *Green*, 757 F.2d at 119 (one additional witness); *Oleson*, 213 F. at 331 (same); *Keating*, 116 F. at 565 (same); *Fulton*, 93 F. at 623 (multiple expert witnesses).

Second, the importance of Hasan's description of the second robber as having "nice hair" and a "Muslim-type beard" to Hugh's defense is undeniable. In a trial at which the major point of contention was the proper identification of the suspect, exhibit D-1-A certainly had the potential to cast significant doubt on the validity of the only formal identification of Hugh that Hasan ever made.[12] Specifically, Hugh's counsel argued in his closing statement that, given Hasan's description, the photographic line-up from which she selected Hugh as one of the robbers was unduly suggestive:

---

[12]Tellingly, the Government never asked Hasan to make an in-court identification of Hugh as the second robber.

21

Well, you'll look at her report, ladies and gentlemen, I've marked it as Exhibit [D-1-A], and in that report, ladies and gentlemen, you read it. She says he had a Muslim-type beard. It's got a little chart for you here. Because she also said he had nice hair. Of the eight people, we have to find the Muslim guy with nice hair.

Well, ladies and gentlemen, let's get rid of the non-Muslim beards, shall we? Guy number one definitely has a Muslim-type beard. Guy number two, my client, definitely has a Muslim-type beard. Guy number three, oh, that ain't a Muslim-beard, ladies and gentlemen. Guy number four, he has a Muslim-type beard. Guy number five, ah you could say that was Muslim. . . .

. . .

. . . Guy number six, that is not a Muslim-type beard. Guy number seven, possibly. And guy number eight, that is definitely not a Muslim-type beard. I will let you make these opinions when you go in there.

So now we've gone from eight to . . . five. Well, still, those odds aren't bad. 20 percent chance, okay? Well let's look at the guy. She said he had nice hair. She remembers the nice hair, remember that?

Who's got nice hair here? He doesn't have hair, so he's not going to be getting Mr. Nice Hair award. He's got very well groomed hair. This guy, we've already taken, yeah, we'll give him [nice] hair. He doesn't even have hair on that picture, ladies and gentlemen. Okay. This guy, his hair is so short, how could you say he has nice hair?

Ladies and gentlemen, I have conducted what? The process of elimination.

. . .

I would ask you, ladies and gentlemen, to look at the page in my hand right now, it says, "Has[a]n." And I wrote process of elimination, because that is what she testified to. She went through a process of elimination. Just like I did. We didn't even have to see the man to do that. And I've gone from eight to two.

And guess what she also said? He was very nicely groomed. He had beautiful hair. Of those two people, ladies and gentlemen, who gets the nice groom award? I'll let you be the judge to that.

Our Court has often had to examine the problems created by suggestive line-ups.

*See, e.g., United States v. Brownlee*, 454 F.3d 131 (3d Cir. 2006); *Thomas v. Varner*, 428 F.3d 491 (3d Cir. 2005). More generally, we have also noted that special care must be

22

taken in contexts like ours: "[T]he evidence was *identification* evidence.  The dangers inherent in such testimony have many times been commented upon.  *Foster v. California*, 394 U.S. 440 (1969); *Simmons v. United States*, 390 U.S. 377 (1968); *United States v. Wade*, 388 U.S. 218 (1967).  Courts must scrutinize this type of evidence especially carefully; *juries must to the same*."  *United States v. Rabb*, 453 F.2d 1012, 1014 (3d Cir. 1971) (second emphasis added).

Rather than acknowledge the significance that exhibit D-1-A might properly play in the jury's decision, the District Court instead ruled that sending Hasan's statement to the jury would give it "undue weight."  This conclusion misses the mark.[13]  The situation here is analogous to a jury request to have portions of testimony read back, which we have previously addressed.   In *Rabb* we noted the possibility that "a reading of only one portion of the testimony may cause the jury to give that portion undue emphasis," but nevertheless concluded that

> [r]eading the transcript of the testimony of two . . . witnesses would not necessarily emphasize it or preclude consideration by the jury of the other testimony.  In these circumstances, *it must be assumed that the jury asked for a reading of this testimony because it was in doubt or in disagreement upon its proper evaluation*.

*Id.* at 1013–14 (emphasis added).  More generally, we went on to note with approval the position advanced by the American Bar Association in its *Standards Relating to Trial by*

---

[13]The majority avoids addressing the issue by erroneously concluding that the District Court did not base its decision on this ground.  *See* Maj. Op. at 11.

*Jury*, ABA PROJECT ON MINIMUM STANDARDS OF CRIMINAL JUSTICE § 5.2 & cmt. at

134–38, which suggests that courts accede to the reasonable requests of jurors to review

specific evidence. *Rabb*, 453 F.2d at 1014–15 & n.1. As the Supreme Court of New

Jersey has observed,

> [w]hen a jury retires to consider their verdict, their discussion may produce
> disagreement or doubt or failure of definite recollection as to what a
> particular witness said in the course of his testimony. If they request
> enlightenment on the subject through a reading of his testimony, in the
> absence of some unusual circumstance, the request should be granted. The
> true administration of justice calls for such action. Where there is a doubt
> in the minds of jurors as to what a witness said, it cannot be prejudicial to
> anyone to have that doubt removed by a rehearing of his testimony. There
> is no need to be chary for fear of giving undue prominence to the testimony
> of the witness. If under our system of trials a jury is to be considered
> intelligent enough to be entrusted with powers of decision, it must be
> assumed they have sense enough to ask to have their memories stimulated
> or refreshed only as to those portions of the testimony about which they are
> in doubt or disagreement.

*State v. Wolf*, 207 A.2d 670, 675–76 (N.J. 1965); *see also United States v. Hans*, 738 F.2d

88, 93 (3d Cir. 1984) (noting that a jury's request to see certain exhibits indicates their

importance); *cf. United States v. McCarthy*, 961 F.2d 972, 978 (1st Cir. 1992) (affirming

trial judge's decision not to send an exhibit back to the jury, but noting that "[t]he jury did

not request it"). The jury's request here similarly demonstrates the importance of exhibit

D-1-A in the context of this case, and it should have weighed heavily in favor of granting

Hugh's motion to reopen. For trial-by-jury to work properly, juries must be allowed the

tools with which to do their job.[14]

C.    Explanation for the Failure to Introduce

Hugh's counsel did not offer an explicit justification for his failure to put exhibit D-1-A in evidence, as the majority notes. *See* Maj. Op. at 6. But even a cursory examination of the trial transcript tells why: Hugh's counsel did not understand that simply marking an exhibit for identification does not make it part of the evidentiary record. *See* Appellant's App. at 528 ("[THE COURT]: [Exhibit D-1-A was] not moved into evidence. So [it] will not go out. [DEFENSE COUNSEL]: Your Honor, I labeled [it] as [a] defendant's exhibit and gave [it] a number. THE COURT: Well, that doesn't mean [it is] in evidence."). Though this mistake was elementary, it was honest. It also

---

[14]It is important to bear in mind that a court's proper concern is not the added weight a jury may attach to a given piece of evidence in the abstract, but rather whether such added weight would be "undue." The evil to be avoided in sending exhibits to the jury is the possibility that the jurors will believe that the *judge* deems a certain piece of evidence to be particularly significant—an evaluation that is instead within the jury's sole purview. The valid concern present when courts usually decide whether to send an exhibit to the jury, therefore, is absent when the jury itself requests to see it. Here, had the District Court simply admitted exhibit D-1-A and sent it back to the jury at the beginning of deliberations along with all the other exhibits, there would have been no possibility that the statement could have been given "undue" weight. Moreover, even if there were such a possibility, a cautionary instruction could have allayed most concerns in that regard. *See Larson*, 596 F.2d at 779 (reversing the defendant's conviction based on the district court's decision not to reopen the record for additional testimony, noting that "even assuming that the testimony might have derived undue emphasis from its appearance subsequent to all parties resting, a cautionary instruction by the trial judge might have remedied that potential problem"); *see also Parker*, 73 F.3d at 54 ("It is clear to us that, with the proper cautionary instruction, the jury could have adequately weighed the additional testimony.").

25

presents a paradigm case for the proper use of a motion to reopen. *See Blankenship*, 775 F.2d at 740 (noting that reopening the record is often used to admit evidence "overlooked by inadvertence"); *cf. Parker*, 73 F.3d at 54 ("[T]he excuse given, that defense counsel simply made a mistake, seems reasonable and does not appear to be a subterfuge for seeking delay or unfair advantage."); *Carter*, 569 F2d at 803 (finding no abuse of discretion where the court allowed the Government to reopen the record and present evidence "inadvertently omitted from the case in chief"). Just as the Government can be permitted to reopen the record and introduce evidence necessary to support a conviction that was mistakenly not presented in its case-in-chief, *see Blankenship*, 775 F.2d at 740 (referring to evidence needed to establish proper venue), so too should the defendant be allowed to do the same when inadvertence has caused him to omit a document significant to his defense.

D.     Prejudice to the Government

The majority mentions the prejudice prong of the analysis—the "most important consideration," *Blankenship*, 775 F.2d at 741—only in passing and only in general. *See* Maj. Op. at 6 ("[T]he government had no occasion to address [exhibit D-1-A] through testimony, exhibits, or comments of counsel in closing."). The Government itself does not address the issue at all. But there is no mystery why this is so: despite the majority's conclusory statement, there would have been no prejudice to the Government in reopening the record to admit exhibit D-1-A.

Both Hasan and the police officer that recorded her statement were the Government's own witnesses. As such, the Government can hardly be heard to argue—and it never has—either that it did not know about Hasan's eyewitness description of the robbers or that the descriptions were somehow inaccurate. *Cf. Blankenship*, 775 F.2d at 741 (affirming the grant of motion to reopen, saying that the non-moving party "could not have been surprised by the evidence"). Moreover, the jury had already been told of exhibit D-1-A's contents. *Cf. Smith*, 1994 WL 680999, at *1 (affirming grant of motion to reopen when the district judge had reasoned thus: "[T]here has already been testimony concerning [the evidence], so I will admit [it]. . . . I mean, the jury has been told about [it]. . . . I don't think there is any prejudice to it. And the jury might very well wonder, want to see [it], and then we are left with that problem."). The majority's claim that there was no occasion for the Government to address exhibit D-1-A in closing is simply not true. After defense counsel argued extensively during his closing statement that the jury should look critically at exhibit D-1-A (without Government objection[15]), the Government had full opportunity to respond in its rebuttal closing statement. It did not. Given this, it is difficult to imagine how the Government

---

[15]The Government now attempts to characterize its failure to object as an exercise in proper courtroom etiquette. *See* Br. of Appellee at 14 n.2 ("[R]ather than interrupt defense counsel's closing argument, the [G]overnment allowed him to complete his closing without interruption, and then objected to sending the Interview Record to the jury as soon as given the opportunity by the court."). We normally call such silence, no matter how polite, a "waiver."

would have been prejudiced by the introduction of exhibit D-1-A. The fact is that no prejudice was possible here, and the majority does not seriously attempt to argue otherwise.

### III. Conclusion

Considering all of the factors relevant to this decision, the District Court should have reopened the record and admitted exhibit D-1-A. It was admissible; reopening the record to admit it would not have disrupted the trial; it would have provided the jury with critically important identification evidence—evidence that the jury specifically requested defense counsel's failure timely to introduce it was an honest (if elementary) mistake; and there would have been no appreciable prejudice to the Government in admitting it. In short, motions to reopen exist precisely for cases like this, and I believe the District Court abused its discretion in denying Hugh's request.[16] Perhaps most notable, though, is that the Assistant U.S. Attorney trying this case never objected to Hugh's motion to reopen in

---

[16]Because I conclude that the District Court erred, I must also decide whether this was harmless. FED. R. CRIM. P. 52(a); *Brink*, 39 F.3d at 426. An error is harmless when "it is highly probable that [it] . . . did not contribute to the jury's judgment of conviction." *United States v. Janotti*, 729 F.2d 213, 220 n.2 (3d Cir. 1984). That is obviously not so in this case. Most significantly, the jury specifically requested to see exhibit D-1-A; based on that alone, one can only conclude that the jury's decision might have been different had its request been granted. Moreover, it would not be an overstatement to say that the balance of the Government's case against Hugh was weak. The other primary evidence against him included (1) a partial fingerprint that a barely trained examiner using discredited methods determined matched Hugh's and (2) testimony from Hugh's girlfriend (who is schizophrenic and prone to hallucinations) about his supposedly (but not very) suspicious behavior in the days after the robbery. Any error here could not be harmless.

the first place.  It is inconceivable to me that justice was served by depriving the jury of relevant, highly probative evidence (not to mention the additional resources that have now been spent in defending the decision).

It is no small matter to say that a district court's decision was an abuse of discretion.  But the ease with which the jury's request could have been honored and the obvious propriety and fairness in doing so lead me to conclude that the decision not to reopen qualifies.  I would reverse Hugh's conviction and remand this case for a new trial.  Therefore, I respectfully dissent.